

**U.S. Department of Justice**

*United States Attorney*
*District of New Jersey*

_____

970 Broad Street, Suite 700                                    (973)645-2700
Newark, NJ 07102

May 7, 2009

**Via Regular Mail**
Honorable Jose L. Linares
United States District Judge
Martin Luther King, Jr. Federal Building
   & U.S. Courthouse
50 Walnut Street
Newark, New Jersey  07101

>      Re:    Maria Pacheco Bolanos v. Oscar Avila, Eric H. Holder, Jr., and
>             Hillary Clinton (09-CV-1208)

Dear Judge Linares:

    Enclosed is a courtesy copy of the United States' Response to the Petition for Writ of *Habeas Corpus*, which was electronically filed today in the above referenced matter.  The memorandum was served upon counsel for Maria Pacheco Bolanos via ECF.

    Thank you for your consideration.

                        Respectfully submitted,

                        RALPH J. MARRA, JR.
                        Acting United States Attorney

                        By: Lakshmi Srinivasan Herman
                        Assistant U.S. Attorney

Enclosure

cc:   Michael A. Orozco, Esq. (by ECF)
      Harry Asatrian, Esq. (by ECF)

## UNITED STATES DISTRICT COURT
### DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| MARIA PACHECO BOLANOS, | : | Hon. Jose L. Linares |
| | : | |
| Petitioner, | : | |
| | : | 09-CV-1208 |
| v. | : | |
| | : | |
| OSCAR AVILA, ERIC H. HOLDER, JR., | : | |
| and HILLARY CLINTON, | : | |
| | : | |
| Respondents. | : | |

---

## UNITED STATES' RESPONSE TO THE PETITION
## FOR WRIT OF *HABEAS CORPUS*

---

RALPH J. MARRA, JR.
Acting United States Attorney
970 Broad Street
Newark, New Jersey 07102
(973) 645-2700

On the Brief:

Lakshmi Srinivasan Herman
Assistant U.S. Attorney

S. Terry Schubert
Senior Trial Attorney
Office of International Affairs

# TABLE OF CONTENTS

Page

PRELIMINARY STATEMENT .................................................1

PROCEDURAL HISTORY ...................................................... 1

THE COSTA RICAN CHARGES ............................................... 3

STATEMENT OF FACTS ...................................................... 3

STANDARD OF REVIEW ...................................................... 5

    A.    THERE IS AMPLE EVIDENCE SUPPORTING MAGISTRATE
          JUDGE FALKS'S FINDING OF PROBABLE CAUSE ................... 5

         1.    THERE WAS AMPLE EVIDENCE TO ESTABLISH
               PROBABLE CAUSE TO SUPPORT THE CHARGE
               OF ACCOMPLICE TO AGGRAVATED HOMICIDE ............. 7

    B.    MAGISTRATE JUDGE FALK CORRECTLY HELD THAT THE
          PETITIONER'S EVIDENCE WAS MERELY CONTRADICTORY
          AND THEREFORE INADMISSIBLE ............................... 14

    C.    MAGISTRATE JUDGE FALK WAS CORRECT NOT TO REQUEST
          ADDITIONAL DOCUMENTS ..................................... 19

    D.    THE CERTIFICATION ORDER CORRECTLY PUTS DECISIONS
          REGARDING HUMANITARIAN AND OTHER NON-JUSTICIABLE
          CLAIMS PROPERLY BEFORE THE SECRETARY OF STATE .......... 20

         1.    COSTA RICA'S MOTIVATION ............................. 21

         2.    PROCEDURES AWAITING THE PETITIONER IN COSTA
               RICA ................................................. 22

          3.    THE THEORETICAL *GALLINA* EXCEPTION .................. 23

         4.    UNITED NATIONS CONVENTION AGAINST TORTURE AND
               OTHER FORMS OF CRUEL, INHUMAN OR DEGRADING
               TREATMENT OR PUNISHMENT ........................... 24

i

E.    THE PETITIONER SHOULD NOT BE RELEASED FROM CUSTODY . . . . 25

    1.    APPLICABLE LAW . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

    2.    18 U.S.C. § 3184 REQUIRES DETENTION OF THE PETITIONER
       AFTER CERTIFICATION OF HER EXTRADITABILITY . . . . . . . . . .27

    3.    THE "SPECIAL CIRCUMSTANCES" TEST DOES NOT
       APPLY ONCE EXTRADITION IS CERTIFIED . . . . . . . . . . . . . . . . . 28

    4.    U.S. FOREIGN INTERESTS SUPPORT DETENTION OF
       A FUGITIVE POST CERTIFICATION . . . . . . . . . . . . . . . . . . . . . . . 30

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

### Preliminary Statement

The Government respectfully submits this memorandum of law in opposition to Maria Pacheco Bolanos' (the "Petitioner") petition pursuant to 28 U.S.C. § 2241, which was filed on March 17, 2009 (the "Petition"). In that Petition, the Petitioner argues that U.S. Magistrate Judge Falk ("Magistrate Judge Falk") erred in finding sufficient probable cause for extradition.

For the reasons set forth below, the Petition should be denied.

### Procedural History

On or about September 16, 2008, the United States Attorney's Office for the District of New Jersey, at the request of Costa Rica, filed a complaint in extradition and supporting documents (attached as Exhibit 1). The Costa Rican government requested the extradition of the Petitioner to Costa Rica under the Extradition Treaty between the United States and Costa Rica (the "Treaty") (attached as Exhibit 2), to face criminal charges for acting as an accomplice to aggravated homicide related to the death of Jose Andres Borrase Taylor (the "Victim").

On or about September 17, 2008, the Petitioner appeared before Magistrate Judge Falk. Magistrate Judge Falk remanded the Petitioner to custody. The extradition hearing was held on or about December 23, 2008, at which time Magistrate Judge Falk received evidence, heard arguments from counsel and heard testimony from Fernando Sanchez Chacon ("Mr. Chacon"), who testified on behalf of the Petitioner regarding how he obtained documents that the Petitioner sought to introduce into evidence during the extradition hearing. (Transcript of the Extradition Hearing, attached as Exhibit 3.)

On or about January 20, 2009, Magistrate Judge Falk issued an order and opinion (the "Opinion") (attached as Exhibit 4) holding the Petitioner subject to extradition under 18

U.S.C. § 3184 to Costa Rica.  In the Opinion, Magistrate Judge Falk found that the Court would not "dwell" on the issue of the applicable Treaty since the "neither the validity nor the applicability of the Treaty ha[d] been challenged."  Opinion, at 4.  In addition, the Court noted that "Article 2 [of the Treaty] provides for the return of the fugitives charged with or convicted of a crime in the requesting state."  Since the Petitioner did not challenge this issue, the Court turned to the sufficiency of the evidence presented.  *Id.* at 5.  The Court found that there was sufficient probable cause to believe that the Petitioner committed the offense for which extradition was sought by Costa Rica.

On or about January 24, 2009, the Petitioner incorrectly filed a Notice of Appeal to the United States Court of Appeals for the Third Circuit (attached as Exhibit 5).  The Third Circuit filed an Order on or about March 4, 2009 (attached as Exhibit 6), and dismissed the Petitioner's appeal based on the parties' agreement.  Subsequently, the Petitioner filed a document entitled "Petition for Writ of *Habeas Corpus* Pursuant to 28 U.S.C.§ 2241" on or about March 17, 2009 (Petition attached as Exhibit 7 without the exhibits) naming Oscar Avila, the Director of the Hudson County Correctional Facility; Michael Mukasey, Attorney General of the United States;[1] and Hillary Clinton, Secretary of State of the United States, as defendants-respondents.  On or about March 23, 2009, this Court ordered the Respondents to answer within 45 days.  The Government files this brief opposing *habeas corpus* relief.

---

[1] The Petition was filed naming Michael Mukasey as the Attorney General of the United States.  Because Eric H. Holder, Jr. is the current Attorney General of the United States, he is now the proper respondent in a Petition for *Habeas Corpus*.

-2-

### The Costa Rican Charges

The Petitioner is charged in the Penal Court of the Judicial Circuit of Cartago, as an accomplice to aggravated homicide, as covered by and punishable under Articles 112 and 47 of the Penal Code of Costa Rica. Trial Court of Cartago's Statement in Support of Extradition (the "Court of Cartago's Statement"), at 2, 7-8; *see also* Indictment and Request To Open Trial (the "Indictment"). A warrant for her arrest was issued on January 4, 1999 by the Penal Court of the Judicial Circuit of Cartago, Costa Rica, in criminal case number 97-200572-349-PE after the Petitioner failed to appear in Court and was declared in contempt. Court of Cartago's Statement, at 10; *see also* Indictment, at 26-27. On May 29, 2000, the Trial Court of Cartago issued a warrant for the international capture of the Petitioner. *Id.* at 27-28. The Petitioner fled Costa Rica during criminal proceedings against her, and therefore has not been convicted of the crime for which she is charged.

Acting as an accomplice to aggravated homicide is an extraditable offense under Article 2, Paragraph 1 of the Treaty between the United States and Costa Rica.

### Statement of Facts

According to an investigation by Costa Rican authorities, the Petitioner and her former boyfriend, Laureano Montero Romero ("Montero Romero") conspired to kill the Victim in late 1997 over a property dispute. On or about November 18, 1997, the Victim and Montero Romero agreed to meet at Montero Romero's residence, where both Montero Romero and the Petitioner lived, to discuss problems regarding their adjoining properties. Court of Cartago's Statement, at 2; Indictment, at 2. When the Victim arrived at the residence, Montero Romero engaged the Victim in an argument and then stunned him unconscious with an electric stick. *Id.*

- 3 -

at 3-4.  Montero Romero then shot the Victim with a twenty-two caliber weapon.  *Id.* at 4.  The Petitioner and an unidentified accomplice helped Montero Romero handcuff and further incapacitate the Victim.  *Id.* at 4-5.  The Petitioner, Montero Romero and the unidentified accomplice forced the Victim into the Petitioner's car and the Petitioner then drove the Victim to the Los Tinoco farm in Tres Rios.  *Id.* at 5-6.

Once at the farm, Montero Romero shot the Victim five times in the back and twice in the neck.  *Id.* at 6.  Afterwards, the Petitioner, Montero Romero and the unidentified accomplice left the Victim's body in the surrounding areas of Banco Popular in San Pedro de Montes de Oca.  *Id.*  The Petitioner then took evidence of the crime, including a shovel, a mattress and a weapon, and disposed of it.  *Id.*  On or about November 19, 1997, the Petitioner took the vehicle used in the homicide and had all four tires changed so that the tire tracks at the scene of the crime would not match her new tires.  *Id.*  On November 19, 1997, the Petitioner also washed her car to remove evidence of the crime.  *Id.* at 6-7.

The Government of Costa Rica found that there was sufficient evidence to charge the Petitioner.  However, the Petitioner fled Costa Rica during the criminal proceedings against her.  She used a false name and false documents to conceal her identity in order to enter the United States.  Court of Cartago's Statement, at 2.

The Petitioner's co-defendant, Montero Romero, was tried and found guilty of aggravated homicide, and has currently served approximately 10 years in jail.

The Petitioner was arrested in the United States on or about September 17, 2008 at the request of the Government of Costa Rica pursuant to the Treaty.

- 4 -

### Standard of Review

Once a magistrate or judge has certified a petitioner as extraditable, the petitioner can only challenge that decision by petitioning for a writ of *habeas corpus*. *Joseph v. Hoover*, 254 F. Supp. 2d 595, 598 (D.V.I. 2003); *see also Shapiro v. Ferrandina*, 478 F.2d 894, 901 (2d Cir. 1973). A Magistrate Judge's certification order under 18 U.S.C. § 3184 is not directly appealable to the Court of Appeals, but is reviewable by this Court upon the filing of a petition for *habeas corpus*. This review is on "extremely limited" grounds, namely (1) whether the magistrate judge had jurisdiction; (2) whether the offense charged is within the Treaty; and (3) whether there was any evidence warranting the finding that there was reasonable ground to believe the accused is guilty. *Sidali v. INS*, 107 F.3d 191, 195-96 (3d Cir. 1997); *see also Joseph*, 254 F. Supp. 2d at 598; *Fernandez v. Phillips*, 268 U.S. 311, 312 (1925). The district court has jurisdiction over this Petition pursuant to 28 U.S.C. § 2241(a) and (c)(4).

First, there is no doubt that Magistrate Judge Falk had jurisdiction to hear this matter, and the Petitioner does not suggest otherwise.[2] Second, during the extradition hearing the Petitioner did not challenge the issue of whether or not the Costa Rican offense of accomplice to aggravated homicide is an offense covered under the Treaty.[3] Nor does the Petitioner raise this issue now. The Petitioner, however, disputes the finding of probable cause regarding the offense.

### A. There Is Ample Evidence Supporting Magistrate Judge Falk's Finding Of Probable Cause

The Government responds to the arguments in Sections IA and IC of the Petition in this Section.

---

[2] Magistrate Judge Falk noted that the Petitioner had not challenged the Court's personal jurisdiction over her. Opinion, at 4, n.4.

[3] Magistrate Judge Falk noted that "Article 2 [of the Treaty] provides for the return of the fugitives charged with or convicted of a crime in the requesting state," and that the Petitioner did not challenge this issue. Opinion, at 5.

It is obvious that Magistrate Judge Falk carefully reviewed the Costa Rican

government's evidence, heard arguments of counsel and heard testimony from Mr. Chacon, who

testified on behalf of the Petitioner regarding how he obtained documents that the Petitioner

sought to introduce into evidence during the extradition hearing. Magistrate Judge Falk's

determination of probable cause, covered in his Opinion finding sufficient evidence to sustain the

charge under 18 U.S.C. § 3184 and the applicable Treaty,[4] is comprehensive, thoughtful and

well-reasoned. The Government could hardly improve upon his analysis. Indeed, the Petitioner

cannot assail his findings of fact; she only argues that the facts do not give rise to probable cause.

The inherent difficulty with this position is that this Court does not have plenary or *de novo*

review in ruling on the *habeas* Petition. The fundamental tenet of review here is that deference

should be given to the decision of Magistrate Judge Falk and whether there is any evidence to

support Magistrate Judge Falk's finding of probable cause.

It is obvious that Magistrate Judge Falk carefully reviewed the Costa Rican

The standard of proof in extradition proceedings is that of probable cause as

defined in federal law. *Matter of Extradition of* Betrand, 1986 WL 8845, at *4 (D.N.J. June 13,

1986); *see also Sindona v. Grant,* 619 F.2d 167, 175 (2d Cir. 1980).[5] This means evidence

---

[4] In addition, it should be noted that extradition treaties must be liberally construed to effect their purpose, namely, the surrender of fugitives for trial for their alleged offenses. *Valentine v. United States ex rel. Neidecker,* 299 U.S. 5, 10 (1936); *see also Factor v. Laubenheimer,* 290 U.S. 276, 293 (1933). This country does not expect foreign governments to be versed in our criminal laws and procedures. *Grin v. Shine,* 187 U.S. 181, 184 (1902). Thus, "[f]orm is not to be insisted upon beyond the requirements of safety and justice." *Fernandez,* 268 U. S. at 312. This approach is mandated by the liberal rules of construction that are to be used in interpreting extradition agreements.

[5] Both 18 U.S.C. § 3184 and Article 9(4) of the Treaty set a probable cause standard in extradition proceedings. *See* Section A. Treaties with language similar to Article 9(4) of the Treaty have been interpreted to establish a standard of proof, i.e., probable cause as defined in federal law. *In re Berri,* 2008 U.S. Dist. LEXIS 77857, at *4 (E.D.N.Y. 2008); *Sidali v. INS,* 914

sufficient to cause a person of ordinary prudence and caution to conscientiously entertain a reasonable belief in the guilt of the accused. *Coleman v. Burnett*, 477 F.2d 1187, 1202 (D.C. Cir. 1973). The Supreme Court stated in Collins v. Loisel, that "[t]he function of the committing magistrate is to determine whether there is competent evidence to justify holding the accused to await trial, and not to determine whether evidence is sufficient to justify a conviction." 259 U.S. 309, 316 (1922); *see also United States ex rel. Sakaguchi v. Kaulukukui,* 520 F.2d 726, 730-31 (9th Cir. 1975) (magistrate's function is to determine whether there is "any" evidence sufficient to establish reasonable or probable cause); *Jimenez v. Aristeguieta,* 311 F.2d 547, 562 (5th Cir. 1962) (magistrate should not require evidence to convince himself that the fugitive was guilty, but only that it furnished good reason to believe that the crime alleged had been committed by the person charged with having committed it); *Merino v. United States Marshal,* 326 F.2d 5, 11 (9th Cir. 1963) (magistrate should determine whether there was "any" evidence to believe the accused was guilty); *In re Ryan,* 360 F. Supp. 270, 273 (E.D.N.Y. 1973) ("any" evidence). That Magistrate Judge Falk accepts the sworn evidence provided by Costa Rica as true inheres in any probable cause determination. *See Collins v. Loisel,* 259 U.S. at 315-16; *see also Matter of Extradition of Marzook I,* 924 F. Supp. 565, 592 (S.D.N.Y 1996) (court must accept as true all statements and offers of proof by the demanding state); *Matter of Extradition of Atta,* 1988 WL 66866, at *4 (E.D.N.Y. June 17, 1988).

## 1.   There Was Ample Evidence To Establish Probable Cause To Support The Charge of Accomplice to Aggravated Homicide

The Government enumerated in Section IV of its reply brief, dated December 12,

---

F. Supp. 1104, 1113 (D.N.J. 1996); *In re extradition of Molnar,* 202 F.Supp.2d 782 (N.D. Ill., 2002).

2008 (attached as Exhibit 8), the many pieces of evidence compiled against the Petitioner and discussed the extensive basis for probable cause in this case in that reply brief.

        Listed below, as was previously submitted to Magistrate Judge Falk, is the evidence that Magistrate Judge Falk reviewed and found sufficient to establish probable cause to support the charge of accomplice to aggravated homicide against the Petitioner.

        a.     The Government of Costa Rica found that there was sufficient evidence to charge the Petitioner and then proceeded with criminal proceedings against her based on those findings. However, the Petitioner fled Costa Rica and used a false name and false documents to conceal her identity to enter the United States. Court of Cartago's Statement, at 2.

        b.     Two witnesses, Martin Carvajal Villalobos ("Mr. Villalobos") and Mariano Sandoval Rodriguez ("Mr. Rodriguez"), stated that when they were leaving Montero Romero's house, where both Montero Romero and the Petitioner lived, they saw a "blond woman . . . [with the] basic characteristics" of the Petitioner arrive. Indictment, at 14.

        c.     Stellar Vargas ("Mr. Vargas") "provided a complete description of the physical characteristics of . . . [the Petitioner]," whom he saw yelling at the Victim and carrying the Victim out of Montero Romero's house with others. *Id.* at 14-15. The Petitioner From Mr. Vargas' statement it can be "derived that [the Victim] was resisting Montero Romero and another unidentified subject . . .; therefore [the Petitioner's] presence was necessary since she [drove] the vehicle because Montero Romero and the other had to dominate the [Victim]." *Id.* at 15.

        d.     The Petitioner's participation was "necessary to comply with the purpose of killing the [Victim] because [she] drove her vehicle" from Montero Romero's residence to the

Los Tinoco farm in Tres Rios. *Id.* at 15.

      e.    The Petitioner then took evidence of the crime, including a shovel, pieces of wood, a bedspread with blood, and disposed of it on the same day as the Victim's murder. *Id.* at 15, 17, 24. It was the Petitioner herself who took the officers of Homicides to the place where she disposed of the evidence of the crime. *Id.* at 17. This evidence was seized by the Costa Rican authorities. *Id.* at 24.

      f.    On or about November 19, 1997, the Petitioner took the vehicle used in the homicide and had all four tires changed so that the tire tracks at the scene of the crime would not match her new tires. *Id.* at 16. Carlos Rolando Alvarez Salazar ("Mr. Alvarez Salazar"), who worked at the tire shop, confirmed that the Petitioner asked him to replace the four tires in her car, which he did. Furthermore, Mr. Alvarez Salazar, "describe[d] a woman with characteristics matching those of [the Petitioner] . . . . "The conduct of . . . [the Petitioner] is obvious, she had to get rid of the tires of the vehicle since their prints ha[d] been marked in the ground of the farm where [the Petitioner and Montero Romero] killed the [Victim]." *Id.* These tires were seized from the car shop. A comparison of the prints made at the grounds of the farm and the Petitioner's car tires show "the same characteristics in class, regarding the structure, shape and external aspect as . . . the tires seized [from the car shop] and therefore those prints could have been made by [the Petitioner's car's] tires . . . ." *Id.* at 16, 25.

      g.    On or about November 19, 1997, the Petitioner also washed her car to remove evidence of the crime. Court of Cartago's Statement, at 7.

      h.    Rodolfo Arronis Castro's ("Mr. Castro") testimony supports the fact that the Victim's murder was premeditated. Mr. Castro testified that Montero Romero had told him

in the "early hours" of November 18, 1997 that Montero Romero and the Petitioner would be gone for three days and asked that Ms. Castro take care of their house. Indictment, at 12, 22. Furthermore, Mr. Castro also testified that "everything [seemed] different from how they always left it, and he [felt] that something strange had taken place . . . ." *Id.* at 12.

      i.    Marcela Carranza Portocarrero is knowledgeable about the problems that her husband, the Victim, and her family experienced with the Petitioner and Montero Romero. "With this witness the Prosecutor's Office will prove that the [Petitioner and Montero Romero] were very problematic persons and that before killing the [Victim] they had already had strong oral confrontations." *Id.* at 23.

      j.    Jorge Mario Borrase Carranza is knowledgeable about the problems that his father, the Victim, and his mother experienced with the Petitioner and Montero Romero. *Id.*

      k.    Three lawsuits (*Montero Romero vs. Marcela Carranza*; *Magdalena Pacheco Bolanos vs. Edificios Borrase*; and *Marcela Portocarrero vs. Inversiones Las Nubes del Este, S.A.,*) establish the legal problems between the Victim and the Petitioner and Montero Romero. *Id.* at 26.

      l.    A defense that the Petitioner put forth in Costa Rica during her initial criminal proceedings before she fled to the United States was that Montero Romero exercised psychological control over her. *Id.* at 19. By virtue of this defense alone, the Petitioner admitted in Costa Rica that she committed the crime.

      Without reiterating its entire earlier December 12, 2008 brief, the Government notes that neither the Petitioner's identity[6] nor her activity is in doubt. In addition to the

---

[6] Magistrate Judge Falk noted that the Petitioner has not contested whether she is the individual named in the charging document. Opinion, at 4, n.4. Furthermore, Magistrate Judge Falk noted that the Petitioner "admits that her identity is 'not in question.'" *Id.* at 8.

evidence in the original package from Costa Rica, which is attached as Exhibit 1 to this brief, the Government also attaches a letter from Roger Mata Brenes of the Cartago Office of the Public Prosecutor, in Costa Rica (the "Letter") (attached as Exhibit 9).[7] The Letter, in part, states that "one of the private investigators hired by Laureano [Montero Romero] placed [the Petitioner] at the scene, having seen her there when she arrived in her brother Juan Carlos' car. Furthermore, the physical description provided by witness Steller Vargas of the person he saw is consistent with [the Petitioner's] appearance at the time." Letter, at 2.

Furthermore, the Petitioner herself voluntarily, in the presence of her attorney, admitted her involvement in the crime in proceedings in Costa Rica. Specifically, "she provided details about having changed the tires on the vehicle she was driving - and in which the victim's body was transported to the place where it was abandoned - in spite of the fact that they were in good condition at the time. [She also stated] that she had gotten rid of a firearm, a rifle, which was consistent with the type of weapon that fired the bullets that killed [the Victim]." *Id.*

Magistrate Judge Falk noted in his Opinion that "[a]lthough much of the evidence described in the charging document is circumstantial at best, Costa Rica is not required to present its entire case in this country, nor is it appropriate for this Court to assess whether the evidence presented is sufficient to justify a conviction. [Footnote omitted.] Instead, this Court must only determine whether there was sufficient legal evidence before the prosecutor in Costa

---

[7] The Letter was not certified in accordance with Title 18 U.S.C. § 3190 when it was provided to Magistrate Judge Falk. The Letter was attached as Exhibit 1 to the Government's Letter Brief, dated January 7, 2009 (attached as Exhibit 10). Magistrate Judge Falk stated that "[a]lthough noteworthy, the Court need not rely on this document in reaching its decision." Opinion, at 8, n.12. The Letter has since been certified in accordance with Title 18 U.S.C. § 3190 (attached as Exhibit 11).

Rica to justify his or her decision to charge [the Petitioner] with the crime at issue. Based on the witness statements as set forth in the Indictment, the totality of the circumstances, and given this Court's limited function in the context of this . . . proceeding, the Court finds sufficient probable cause to sustain the charge. [Footnote omitted.]  The Court's inquiry ends here. [Footnote omitted.]"  Opinion, at 8-9.

Contrary to the Petitioner's claims, the Government has submitted, on behalf of Costa Rica, more than sufficient evidence upon which Magistrate Judge Falk could reasonably find probable cause for a charge of accomplice to aggravated homicide against the Petitioner. On or about September 16, 2008, the Government submitted the following documents to Magistrate Judge Falk on behalf of Costa Rica: 1) a document from the Trial Court of Cartago to the U.S. Department of Justice; 2) a Criminology Report; 3) Trial Opening Resolution; 4) Indictment and Request to Open Trial; 5) a document ordering the International Authorities to capture the Petitioner; and an 6) Order of International Detention. *See* Exhibit 1.  The Petitioner's lawyers incorrectly state that Costa Rica produced only "a verified petition." Petition, at 8.  As listed above, Costa Rica produced more than a "verified petition" in this case.

Petitioner contends that Article 9(4) requires the Requesting State to furnish a particular type of evidence. This contention is baseless.

Article 9(4) states the following:

> When the request for extradition relates to <u>a person who has not yet been convicted</u>, it shall be accompanied by:
>
> (a) A copy of the charging document, or an equivalent document issued by a judge or judicial authority; <u>and</u>
> (b) Such evidence, as in accordance with the laws of the Requested State, would be necessary to justify the apprehension and commitment for trial of the person sought if the offense

had been committed there.[8] [Emphasis added.]

Article 9(4)(b) refers to the standard of evidence, i.e., probable cause as defined in federal law, not the "types" of evidence. Treaties with language similar to Article 9(4) of Treaty have been interpreted to establish a standard of proof, i.e., probable cause. *Berri*, 2008 U.S. Dist. LEXIS 77857, at *4; *see also Sidali*, 914 F. Supp. at 1113; *Molnar*, 202 F. Supp. 2d 782. Any type of evidence will suffice for a probable cause determination, when the facts are sufficient to establish probable cause - as they are in this case.[9] The Petitioner makes an irrelevant and incorrect formalistic argument about a supposed "verified petition" submitted by Costa Rica being sufficient only where a petitioner or fugitive has been <u>convicted</u> in a foreign country. In focusing on this formalistic approach, the Petitioner entirely overlooks that the evidence against her is overwhelming - more than enough to sustain a charge under 18 U.S.C. §

---

[8] The Petitioner incorrectly refers to Article 9(4)(c) instead of Article 9(4)(b). Petition, at 18.

[9] *See Afanasjev v. Hurlburt*, 418 F.3d 1159, 1163-65 (11th Cir. 2005) (holding that a Lithuanian *bill of indictment containing unsworn allegations by a Lithuanian investigator and unsworn hearsay statements by witnesses and victims* constituted competent legal evidence for purposes of the extradition proceeding so that the magistrate judge did not err in relying on the bill of indictment in ordering the Petitioners be extradited) (emphasis added); *see also Emami v. U.S. Dist. Court for Northern Dist. of California*, 834 F.2d 1444 (9th Cir. 1987) (holding that hearsay statements *summarized by a German prosecutor in his affidavit supporting extradition* of Iranian physician to Germany was admissible where doctor had not challenged authentication of affidavit and there was no conflict with specific provisions of extradition Treaty) (emphasis added); *Zanazanian v. United States of America*, 729 F.2d 624 (9th Cir. 1984) (authenticated document containing police officer's report describing witnesses' detailed statements, which incriminated the witnesses themselves and amounted to confessions to participation in Petitioner's illegal narcotics activities, provided sufficient competent legal evidence to support a finding of Petitioner's extraditability); *Artukovic v. Rison*, 784 F.2d 1354, 1356 (9th Cir. 1986) (unsworn hearsay statements contained in properly authenticated documents can constitute competent evidence to support a certificate of extradition); *In re Extradition of Sainez*, 2008 WL 366135, at *18 (S.D. Cal. Feb. 8, 2008) ("inconsistencies are not sufficient to negate the showing of probable cause. Instead, [they] raise issues which are appropriate for determination at a full trial . . . ."); *Murphy v. U.S.*, 1998 WL 1179110, at *3 (N.D.N.Y. December 2, 1998) ("A careful reading of the statements of all the victims shows that although the statements are unsworn and some are vague as to the exact time, here are sufficient allegations to meet the probable cause standard . . . .")

- 13 -

3184.[10]

The submitted evidence permitted Magistrate Judge Falk to apply a "totality-of-the-circumstances analysis" and "make a practical, common-sense decision whether, given all the circumstances . . . [that] there is a fair probability that" the Petitioner committed the crime charged. *In Matter of Extradition of Glantz*, 1995 WL 495644, at *2 (S.D.N.Y. August 21, 1995) (*quoting Illinois v. Gates*, 462 U.S. 213, 238 (1983)).[11]  Given the substantial evidence against the Petitioner, this Court should also readily conclude that there was plainly some evidence to support Magistrate Judge Falk's finding that probable cause has been met in this case.  For the same reason, the Petitioner's argument that due process requires that she be afforded an evidentiary hearing before this Court also should be denied.

**B.      Magistrate Judge Falk Correctly Held That The Petitioner's Evidence Was Merely Contradictory And Therefore Inadmissible**

The Government responds to the arguments in Section IB of the Petition in this Section.

As previously discussed, the standard of proof in extradition proceedings is that of probable cause as defined in federal law.  Therefore, the evidence that a petitioner may attempt to introduce is limited to that evidence which explains rather than contradicts the demanding country's proof. *Hooker v. Klein*, 573 F.2d 1360, 1368 (9th Cir. 1978).  The

---

[10] *Matter of Extradition of Lehming* is a case where the fugitive's proof was insufficient to establish probable cause because of the evidence that was presented before the Court, not because the form of the evidence was hearsay.  951 F. Supp. 505 (D.Del. 1996).

[11] "Although evidence tying defendant to shooting was circumstantial and less than overwhelming, foreign government is not required to present its entire case in this country, but rather, evidence presented need only support reasonable belief that defendant was guilty of crimes charged." *Austin v. Healy*, 5 F.3d 598, 605 (2d Cir. 1993).

district court in the *Matter of Sindona* discussed the distinction between contradictory and

explanatory evidence and cited the established authority for the proposition that an extradition

hearing should not be transformed into a full trial on the   merits:

> The distinction between "contradictory evidence"
> and "explanatory evidence" is difficult to articulate.
> However, the purpose behind the rule is reasonably
> clear. In admitting "explanatory evidence," the
> intention is to afford an accused person the opportunity
> to present reasonably clear-cut proof which would be
> of limited scope and having some reasonable chance
> of negating a showing of probable cause. The scope
> of this evidence is restricted to what is appropriate to
> an extradition hearing. The decisions are emphatic
> that the extraditee cannot be allowed to turn the
> extradition hearing into a full trial on the merits.
> The Supreme Court has twice cited with approval
> a district court case which aptly summarizes the
> relevant considerations. The Supreme Court decisions
> are *Collins v. Loisel*, 259 U.S. 309, 316, 42 S.Ct. 469,
> 66 L.Ed. 956 (1922), and *Charlton v. Kelly*,
> 229 U.S. 447,461, 33 S.Ct. 945, 57 L.Ed. 1274 (1913).
> In *In re Wadge*, 15 F. 864, 866 (S.D.N.Y 1883) the
> court dealt with the argument of an extraditee that he
> should be given an extensive hearing in the extradition
> proceedings: "If this were recognized as the legal right
> of the accused in extradition proceedings, it would give
> him the option of insisting upon a full hearing and trial
> of his case here; and that might compel the demanding
> government to produce all its evidence here, both direct
> and rebutting, in order to meet the defense thus gathered
> from every quarter. The result would be that the foreign
> government though entitled by the terms of the
> Treaty to the extradition of the accused for the purpose
> of a trial where the crime was committed, would be
> compelled to go into a full trial on the merits in a foreign
> country, under all the disadvantages of such a situation,
> and could not obtain extradition until after it had procured
> a conviction of the accused upon a full and substantial trial
> here. This would be in plain contravention of the
> intent and meaning of the extradition treaties."

450 F. Supp. 672, 685 (S.D.N.Y. 1978).

The extent to which the Petitioner may offer explanatory proof is largely within the discretion of the committing judicial officer. *Hooker*, 573 F.2d at 1369; *United States ex rel. Petrushansky v. Marasco*, 325 F.2d 562, 567 (2d Cir. 1963) (and cases cited therein). The issue is relevant to "explain away" the probable cause finding as opposed to contradicting the evidence submitted by the Requesting State or raising affirmative trial style defenses. Consequently, some matters are clearly contradictory and thus impermissible. The Petitioner may not introduce evidence that conflicts with the evidence submitted on behalf of the demanding state (*Collins*, 259 U.S. at 315-17); establishes an alibi (*Abu Eain v. Adams*, 529 F. Supp. 685 (N.D. Ill. 1980)); sets up an insanity defense (*Hooker*, 573 F.2d 1360); or impeaches the credibility of the demanding country's witnesses (*In re Locatelli*, 468 F. Supp. 568 (S.D.N.Y. 1979)).

At an extradition hearing,

> [t]he accused is not entitled to introduce evidence which merely goes to his defense but he may offer limited evidence to explain elements in the case against him, since the extradition proceeding is not a trial of the guilt or innocence but of the character of a preliminary examination held before a committing magistrate to determine whether the accused shall be held for trial in another tribunal.

*Jimenez v. Aristeguieta*, 311 F.2d 547, 556 (5th Cir. 1962). A Petitioner may not present evidence that contradicts the evidence presented by the Government, but may present only explanatory evidence. *Matter of Demjanjuk*, 603 F. Supp. 1463, 1464-65 (N.D. Ohio 1984); *United States v. Fernandez-Morris*, 99 F. Supp. 2d 1358, 1366 (S.D. Fl. 1999). Explanatory evidence is evidence rebutting probable cause, not evidence in defense. *Demjanjuk*, 603 F.Supp. at 1464. "The magistrate does not weigh conflicting evidence and make factual determinations but, rather, determines only whether there is competent evidence to support the

belief that the accused has committed the charged offense." *Quinn v. Robinson*, 783 F.2d 776, 815 (9th Cir. 1986); *Austin*, 5 F.3d at 605 (quoting *Quinn*).

The Petitioner argued in her Petition and at the extradition hearing that three contradictory, unauthenticated, unattested, purported statements by Mr. Villalobos,[12] Mr. Rodriguez[13] and Mr. Vargas[14] undercut the substantial evidence submitted by Costa Rica against her. These statements may not be introduced in the context of this process as they are not authenticated, admissible or explanatory evidence. Even if these three statements were authenticated and otherwise admissible, they are merely contradictory evidence and therefore not admissible in this extradition proceeding. They are not limited in scope and do not "obliterate" or undercut the substantial evidence submitted by the Government on behalf of Costa Rica. The exercise of looking at various witness statements and comparing them to each other in the context of the entirety of the evidence is a task specifically reserved for the trier of fact in Costa Rica.

In addition, the Petitioner also argued in her Petition, in briefs submitted to Magistrate Judge Falk and at the extradition hearing that the Costa Rican prosecutor had made deliberate "misstatements"with regard to the evidence against her, and "90% of what is contained in the [Costa Rican government's] petition is, unequivocally, a lie and fabricated."

---

[12] Mr. Villalobos stated that "a white car, with polarized glass arrived, driven by a woman who seemed mannish . . . ." Exhibit A, at 6, which was appended to the Petitioner's brief dated November 3, 2008 (attached as Exhibit 12).

[13] Mr. Rodriguez stated that he "was able to observe a fair haired woman, who was driving a white vehicle." Exhibit B, at 4, which was appended to the Petitioner's brief dated November 3, 2008 (attached as Exhibit 12).

[14] Mr. Vargas stated that "[t]he woman was like mannish, somewhat slender, or normal weight, rather." Exhibit C, at 2,  which was appended to the Petitioner's brief dated November 3, 2008 (attached as Exhibit 12).

Petition, at 9. This Court should accept as true the sworn evidence provided by Costa Rica in any probable cause determination. *See Collins*, 259 U.S. at 315-16; *Marzook I*, 924 F. Supp. at 592 (court must accept as true all statements and offers of proof by the demanding state); *Atta*, 1988 WL 66866, at *4.

As Magistrate Judge Falk wrote, the Petitioner submitted "several pieces of evidence, including what appears to be the actual statements of three of the witnesses referred to in the Indictment: (a) Martin Villalobos, (b) Mariano Rodriguez, and (c) Juan Vargas. *[The Petitioner] admits that such statements were utilized by Costa Rica to establish probable cause and are referred to in the Indictment*. [Emphasis added.] In this regard, she argues that '[n]ot only does the witness not identify the 'woman,' the statement provides no description as to the race, age, build, or any other identifying characteristic from which an identification could be developed or compared.' [The Petitioner] also claims that the 'Costa Rican prosecutor, instead of providing the court with an accurate interpretation of what the witness actually said, 'interprets' this non-identification into an identification by his conclusory statement that it was [the Petitioner].' There is no question that such evidence has been offered by [the Petitioner] to contradict the findings of the Costa Rican prosecutor. Contradictory evidence may not be considered by this Court. [Citations omitted.] Even if the Court were to construe such evidence as explanatory - rather than contradictory - the Court may not weigh the evidence and make factual determinations. [Citations omitted.] Such a task is specifically reserved for the trier of fact in Costa Rica." Opinion, at n.14.

In conclusion, Magistrate Judge Falk correctly decided that the Petitioner's evidence was contradictory and therefore inadmissable.

**C.   Magistrate Judge Falk Was Correct Not To Request Additional Documents**

The Government responds to the arguments in Section ID of the Petition in this Section.

The evidence submitted to Magistrate Judge Falk was more than sufficient to establish probable cause that the Petitioner committed the crime that she is charged with in Costa Rica, and Magistrate Judge Falk so held. However, in the event Magistrate Judge Falk found that the extradition package was insufficient, Article 10 of the Treaty expressly provided and called for the Requested State, here the United States, to seek additional documentation in support of the request for extradition. "If the Requested State considers that the documents furnished in support of the request for extradition of a person sought are not sufficient . . . that State *shall* request the submission of necessary additional documents." Article 10 of the Treaty. (Emphasis added.) That this Court and Magistrate Judge Falk accept the sworn evidence provided by Costa Rica as true inheres in any probable cause determination. *Collins*, 259 at 315-16; *Marzook I*, 924 F. Supp. at 592 (court must accept as true all statements and offers of proof by the demanding state); *Atta*, 1988 WL 66866, at *4. Magistrate Judge Falk chose not to request additional documents and found sufficient probable cause based on the documents that the Government, acting on behalf of the Costa Rican government, submitted to

him.[15]  Since this Court's review of this petition is not plenary or *de novo*, this Court should

give deference to Magistrate Judge Falk's decision.[16]

**D.    The Certification Order Correctly Put Decisions Regarding Humanitarian and Other Non-Justiciable Claims Properly Before the Secretary of State**

The Government responds to the arguments in Section IE of the Petition in this

Section.

The Petitioner asks this Court to examine matters that are well settled as beyond

the scope of 18 U.S.C. § 3184.  These matters should be considered by the Secretary of State.

Traditionally, extradition has been a matter for the Executive Branch.  The

Judicial Branch performs only a limited inquiry under 18 U.S.C. § 3184, and then the Secretary

of State retains complete authority to decide whether to grant or decline a request for

extradition under 18 U.S.C. § 3186.  Issues regarding the treatment of the Petitioner upon her

---

[15] The court in *U.S. v. Barr* held that since the evidence submitted "does not mention or suggest any *act* by [Barr] . . . [and] amount[ed] to charges based on 'mere presence' in the vicinity [of the shooting]" probable cause had not been met.  619 F. Supp. 1069, 1071 (E.D. Pa. 1985).  The court in *Republic of France v. Moghadam* held that since the principal accuser, who was in a French jail, recanted her accusation, and the circumstances and substance of her recantation "had more indicia of reliability than [the] original accusation" probable cause had not been met.  617 F. Supp. 777, 777 (N.D. Calif., 1985).  Here, unlike both the fugitives in *Barr* and *Moghadam*, Magistrate Judge Falk correctly held that "[b]ased on the witness statements as set forth in the Indictment, the totality of the circumstances, and given [the] Court's limited function in the context of [the] . . . proceeding, the Court finds sufficient probable cause to sustain the charge."  Opinion, at 8-9.

[16] The Petitioner argues that Article 9(4)(b) of the Treaty, which states that "[w]hen the request for extradition relates to a person *who has not yet been convicted*, it shall be accompanied by: (b) [s]uch evidence, as in accordance with the laws of the Requested State, would be necessary to justify the apprehension and commitment for trial of the person sought if the offense had been committed there," applies in this case. [Emphasis added.]  Of course it applies here and Magistrate Judge Falk held that the standard of proof of probable cause, as defined in federal law, and under the Treaty in Article 9(4)(b), was satisfied.

return to Costa Rica are matters to be decided by the Executive Branch. *U.S. v. Kin-Hong*, 110 F.3d 103, 110-11 (1st Cir. 1997). The rule of non-inquiry bars courts from evaluating the fairness of foreign justice systems and conditions of confinement. *Hoxha v. Levi*, 465 F.3d 554, 563 (3d Cir. 2006). Some courts have suggested they could imagine an exception to the rule of non-inquiry in cases that shocked the conscience, *see, e.g., Gallina v. Fraser*, 278 F.2d 77, 79 (2d Cir. 1960), but no court has denied extradition on those grounds alone, *see U.S. v. Fernandez-Morris*, 99 F.Supp.2d 1358, 1372 (S.D. Fla. 1999) (holding that lack of due process given to the defendant during his trial *in absentia* in Bolivia did shock the conscience of the district court, but since Bolivia failed to establish probable cause, the Court did not have to decide whether the *Gallina* exception existed for due process).

### 1. Costa Rica's Motivation

The Petitioner suggests that this Court look behind the extradition request to the motives of the Costa Rican government. The answer to this request is found in *In re Lincoln*, 228 F. Supp. 70, 74, (E.D.N.Y. 1915): "It is not a part of the court proceedings nor of the hearing upon the charge of the crime to exercise discretion as to whether the criminal charge is a cloak for political action, nor whether the request is made in good faith. Such matters should be left to the Department of State . . . ." In *In re Gonzalez*, the court further noted that 18 U.S.C. § 3184 gives it no authority to inquire into such matters. 217 F. Supp. 717, 722, n.15 (S.D.N.Y. 1963); *accord In re Extradition of Singh*, 123 F.R.D. 127, 129-37 (D.N.J. 1987) (citing cases on doctrine of non-inquiry). In *Ramos v. Diaz*, the court clearly stated that the motive of the demanding government in an extradition proceeding is not controlling; the circumstances surrounding the offense when it occurred are dispositive. 179 F. Supp. 459, 463 (S.D. Fla. 1959); *see also Matter of Locatelli*, 468 F. Supp. 568, 575 (S.D.N.Y. 1979).

- 21 -

## 2. Procedures Awaiting the Petitioner in Costa Rica

Similarly, the Petitioner draws this Court's attention to the "fairness" of the proceedings she may face in Costa Rica, and impugns the integrity of the Costa Rican judicial and criminal justice systems. Questions concerning the judicial procedure in Costa Rica, the requesting state, and the treatment that might be accorded the Petitioner after extradition are not proper matters for consideration by the certifying judicial officer. *Ahmad v. Wigen*, 910 F.2d 1063, 1066 (2d Cir. 1990) (citing *Sindona*, 619 F.2d at 174) ("The interests of international comity are ill-served by requiring a foreign nation . . . to satisfy a United States district judge concerning the fairness of its laws and the manner in which they are enforced. It is the function of the Secretary of State to determine whether extradition should be denied on humanitarian grounds."); *Jhirad v. Ferrandina*, 536 F.2d 478, 484-85 (2d Cir. 1976), *cert. denied*, 429 U.S. 833 (1976) (holding that "[i]t is not the business of [United States] courts to assume the responsibility for supervising the integrity of the judicial system of another sovereign nation."); *Spatola v. United States*, 741 F. Supp. 362, 371 (E.D.N.Y. 1990) ("since comity – i.e., respect and cooperation between sovereign nations – is at the very heart of extradition, a judicial proceeding in extradition is not the proper vehicle for challenging or questioning the fairness of another country's criminal justice system."); *Arnbjornsdottir-Mendler v. United States*, 721 F.2d 679, 683 (9th Cir. 1983); *Garcia-Guillern v. United States*, 450 F.2d 1189, 1192 (5th Cir. 1971); *Matter of Extradition of Tang Yee-Chun*, 674 F. Supp. 1058, 1068-69 (S.D.N.Y. 1987). They are reserved for review by the Secretary of State and beyond the scope of the 18 U.S.C. § 3184 review.

Considering the same issue in a slightly different context, the Court of Appeals for the District of Columbia Circuit said:

- 22 -

> What we learn from *Neely* [*Neely v. Henkel*, 180 U.S. 109]
> is that a surrender of an American citizen required by Treaty
> for purposes of a foreign criminal proceeding is unimpaired
> by an absence in the foreign judicial system of safeguards in
> all respects equivalent to those constitutionally enjoined
> upon American trials.

*Holmes v. Laird*, 459 F.2d 1211, 1219 (D.C. Cir. 1972); *accord Pfeifer v. United States Bureau of Prisons*, 468 F. Supp. 920 (S.D. Cal. 1979). Furthermore, even the *Gallina* court disposed of the issue relating to the lack of constitutional and procedural protections in the Requesting State with the following words:

> Regardless of what constitutional protections are given to
> persons held for trial in the courts of the United States or
> of the constituent states thereof, those protections cannot be
> claimed by an accused whose trial and conviction have been
> held or are to be held under the laws of another nation,
> acting according to its traditional processes and within the
> scope of its authority and jurisdiction.

*Gallina v. Fraser*, 177 F. Supp. 856, 866 (D.C. Conn. 1959).

### 3. The Theoretical *Gallina* Exception

The Petitioner argues that she fits within the "narrow exception discussed in *Gallina* because the motive behind the extradition of [the Petitioner] is questionable, at best." Petition, at 20. The *Gallina* court stated that it could "imagine" situations where upon extradition a Petitioner "would be subject to procedures or punishment so antipathetic to a federal court's sense of decency as to require reexamination of the principle" of non-inquiry. 278 F.2d at 79 (holding that Gallina, who was convicted *in absentia* in Italy was represented by counsel, and the decision to surrender Gallina was a decision for the Secretary of State). "Since *Gallina*, several courts have hinted at the existence of such an exception. The exception remains theoretical, however, because no federal court has applied it to grant habeas relief in an extradition case." *Hoxha*, 465 F.3d at 564, n.14. In *Hoxha*, the Court held that it was within

- 23 -

the "sole discretion of the Secretary of State to refuse to extradite an individual on

humanitarian grounds . . ." even though the Court had concerns that Hoxha would be subject to

being beaten and tortured if he were extradited.  The *Hoxha* court noted that the "U.S. State

Department is aware that Albanian police have beaten and tortured suspects and that prison

conditions in Albania are poor . . . and strongly encouraged the State Department to 'seriously

examine the charges of torture that Hoxha has levied against Albanian authorities and faithfully

uphold[ ] this Government's clear policy of refusing to extradite a person when there are

substantial grounds for believing the person would be subject to torture.'" *Id.* at n.13.

In this case, the Petitioner's allegations do not, in any manner, come close to the

facts postulated in either *Gallina* or *Hoxha*, and even those cases did not sufficiently "shock the

conscience" to require a reexamination of the principle of non-inquiry.  Therefore, this Court

should decline to consider the Petitioner's humanitarian claims in the context of the

extraditability analysis as it is within the sole discretion of the Secretary of State to refuse to

extradite and surrender an individual on humanitarian grounds.

### 4. United Nations Convention Against Torture and Other Forms of Cruel, Inhuman or Degrading Treatment or Punishment

Legislation implementing the United Nations Convention Against Torture and

Other Forms of Cruel Inhuman or Degrading Treatment or Punishment ("CAT") provides that

it is the policy of the United States not to expel, extradite, or otherwise effect the involuntary

return of an individual to a country in which there are substantial grounds for believing the

person would be in danger of being subjected to torture.  Foreign Affairs Reform and

Restructuring Act of 1998,  8 U.S.C. § 1231 (the "FARR Act").  The FARR Act required that

the CAT be implemented by the appropriate agencies, in this case the Department of State.  *Id.*

State Department regulations and guidelines were developed for the consideration and

resolution of claims under the CAT and require that the Secretary of State determine whether it

- 24 -

"is more likely than not" that a person facing extradition will be tortured in the Requesting State. 22 C.F.R. § 95.2(b). Such a determination is made only after a fugitive has been found extraditable by a U.S. court. *Id.* § 95.3(a). After analyzing the relevant information, the Secretary of State may decide to surrender the fugitive, deny surrender, or surrender the fugitive subject to conditions. *Id.* § 95.3(b). Therefore, the argument raised by the Petitioner regarding her safety is simply not a basis for this Court to overturn Magistrate Judge Falk's decision finding sufficient probable cause in this case.

In conclusion, the arguments raised by the Petitioner regarding Costa Rica's motives, the law and procedures which await her, and her ultimate safety upon return to Costa Rica are not alone or in combination a basis for this Court to overturn Magistrate Judge Falk's decision finding sufficient probable cause and certifying this case to the Secretary of State for further determination on extradition and surrender.

### E.   The Petitioner Should Not Be Released From Custody

The Petitioner prays that this Court "order [her] immediate release from custody under reasonable conditions of supervision." Petition, at 22. For the reasons stated below, the Petitioner's request should be denied.

### 1.   Applicable Law

The federal statute that implements the United States' extradition treaties with other nations, Title 18 U.S.C. §§ 3184 *et seq.*, does not provide for bail. Because an international extradition is not a criminal case, the Bail Reform Act, Title 18 U.S.C. §§ 3141 *et seq.*, does not apply and the criteria governing the allowance and the amount of bail in United States criminal cases, 18 U.S.C. § 3142(g), are not applicable. *Kamrin v. United States*, 725 F.2d 1225, 1227-28 (9th Cir. 1984). The Bail Reform Act applies only to offenses against the United States that are triable in United States courts. Requests for extradition involve offenses

against the laws of foreign countries.  Therefore, the Bail Reform Act is inapplicable.[17]

Notwithstanding the silence of federal statute, the Treaty between the United

States and Costa Rica explicitly prevents the Petitioner's release: "A person detained pursuant

to the Treaty shall not be released until the extradition request has been finally decided, unless

such release is required under the extradition law of the Requested State or unless this Treaty

provides for such release."  Art. 12 of Treaty, Dec. 16, 1982, S. Treaty Doc. No. 98-17.[18]  The

Treaty has the full force and effect of a federal law.  U.S. Const. art. VI, sec. 2 ("all Treaties

made, or which shall be made, under the Authority of the United States, shall be the Supreme

Law of the Land."); *Valentine*, 299 U.S. at 10 (1936) (citing *Foster v. Neilson*, 27 U.S. 253,

314 (1829) (Marshall, C.J.)) (Treaty is equivalent to an act of the Legislature).  Furthermore, no

extradition law of the United States requires the Petitioner's release.

Article 12 of the Treaty should suffice to end the Court's inquiry.  *Rainbow*

*Nav., Inc. v. Department of Navy*, 911 F.2d 797, 801 (D.C. Cir. 1990) ("The clear import of

treaty language controls") (*quoting Sumitomo Shoji America, Inc. v. Avagliano*, 457 U.S. 176,

1280 (1982) *and Maximov v. United States*, 373 U.S. 49, 54 (1963)).  The relevant, specific

provision of a duly enacted Treaty in force precludes resort to federal common law.

Nonetheless, the preponderance of relevant case law favors the Government's opposition to

bail.

---

[17] The term "offense" for the purposes of Section 3141 is defined in 18 U.S.C. § 3156(a)(2) as "any criminal offense, other than an offense triable by court-martial, military commission, provost court, or other military tribunal, which is in violation of an Act of Congress and is triable in any court established by Act of Congress . . . ."

[18] The Treaty between the United and Costa Rica may be the only extradition Treaty in effect to contain this explicit prohibition. *See* 4 M. Abell & B. Ristau, *International Judicial Assistance* § 13-3-1(7) at 183 & n.2 (1997 & Supp.).

### 2.  18 U.S.C. § 3184 Requires Detention Of The Petitioner After Certification Of Her Extraditability

The court's authority to conduct international extradition proceedings is clearly delineated in the federal extradition statute.  18 U.S.C. § 3184.  In pertinent part, this statute requires that after certification a magistrate or district court judge "*shall issue* a warrant for the commitment of the person so charged to the proper jail, *there to remain* until such surrender shall be made." (Emphasis added.)  Such plain language precludes the granting of bail after the extradition is certified.

The "shall issue" and "there to remain" language of 18 U.S.C. § 3184 is not susceptible to misinterpretation.  *Connecticut Nat'l Bank v. Germain*, 503 U.S. 249, 253-54 (1992). ("[I]n interpreting a statute a court should always turn to one cardinal canon before all others . . . [C]ourts must presume that a legislature says in a statute what it means and means in a statute what it says there.")  Here, the statute clearly compels the court to commit the Petitioner to federal custody during the post-certification phase of the extradition process.[19] Furthermore, the allowance for bail after the Petitioner is certified as extraditable would improperly render this language mere surplusage.  *United States v. Menasche*, 348 U.S. 528, 538-39 (1955) ("It is our duty 'to give effect, if possible, to every clause and word of a

---

[19] That the "shall issue" language compels mandatory commitment of a petitioner is further reinforced by interpretations of similar statutory language in other contexts. For example, the federal competency statute, 18 U.S.C.§ 4241(d), provides that after a determination of mental incompetency, the court "*shall commit* the defendant to the custody of the Attorney General." (Emphasis added.) Applying the plain meaning approach, and in the absence of any contrary congressional intent, courts have uniformly held that this "shall commit" language mandates the commitment of a defendant. *See, e.g. United States v. Filippi*, 211 F.3d 649, 651 (1st Cir. 2000); *U.S. v. Magassouba*, 544 F.3d 387, 404-05 (2d Cir. 2008); *In re Newchurch*, 807 F.2d 404, 409-10 (5th Cir. 1986); *United States v. Shawar*, 865 F.2d 856, 860 (7th Cir. 1989); *United States v. Ferro*, 321 F.3d 756, 761 (8th Cir. 2003); *United States v. Donofrio*, 896 F.2d 1301, 1302 (11th Cir. 1990).

statute.'"); *see also Duncan v. Walker*, 533 U.S. 167, 174 (2001) (expressing Court's

"'reluctan[ce] to treat statutory terms as surplusage in any setting,' " but especially when they

play "a pivotal role in the statutory scheme'"). The language of 18 U.S.C. § 3184 compelling

committal of the Petitioner post-certification is indeed "pivotal" to the extradition statute; it

ensures that the United States will be able to meet its treaty obligations to surrender the

Petitioner once those treaty requirements are met.

### 3. The "Special Circumstances" Test Does Not Apply Once Extradition Is Certified

Given the above, there is no need for a "special circumstances" analysis post-

certification. *Wright v. Henkel*, 190 U.S. 40 (1903). As evidenced in *Wright*, as well as by the

language of 18 U.S.C. § 3184, there are two distinct phases to the extradition process. The first

phase, the pre-certification phase, encompasses the proceedings leading up to the issuance of

the certification and committal order under 18 U.S.C. § 3184. This stage is not controlled by

any statute regarding bail, although subject to the same general considerations "which induced

the language used in the statute," namely the obligation of the United States to surrender the

Petitioner. *Id.* at 62. The second phase, the post-certification stage, is governed by the

statutory rule that the Petitioner "shall" be committed to custody "there to remain" until her

surrender to the foreign country. *Id.*

It is to this initial extradition stage that the decision in *Wright* applies. *Wright*

was a pre-certification case where the fugitive applied for *habeas* relief following the denial of

his bail application but __prior__ to the commissioner's extradition determination. *Id.* at 57 ("the

writ was applied for in this instance before the commissioner had entered upon the

examination"); *see also, e.g., In re Extradition of Russell*, 647 F. Supp. 1044, 1046 (S.D. Tex.

1986). Addressing the case during the pre-certification stage, the Supreme Court held that

special circumstances could permit the granting of bail notwithstanding the absence of a statute specifically authorizing bail. *Wright*, 190 U.S. at 63. The Court, however, did not purport to extend its holding to the post-certification extradition stages, and indeed recognized that such authority would be "inconsistent" with the federal extradition statute. *Id.* at 62 ("[Section] 5270 of the Revised Statutes [the predecessor of the current extradition statute] . . . is inconsistent with its allowance after committal, for it is there provided that, if he finds the evidence sufficient, the commissioner of judge 'shall issue his warrant for the commitment of the person so charged to the proper jail, there to remain until such surrender shall be made.'"). After discussing the Government's treaty obligations to surrender a fugitive and the potential harm that could result if bail was allowed, the Court further went on to note that "the same reasons which induced the language used in the statute would seem generally applicable to release *pending examination.*" *Id.* at 62. (Emphasis added.)[20] By distinguishing between the controlling statutory language prohibiting bail after certification and the absence of similar language addressing pre-hearing bail considerations, the Court clearly recognized the existence

---

[20] A recent district court decision rejected this argument, determining that *Wright* made no analytical distinction between pre- and post-certification bail applications, and as a result a court has inherent power to grant bail in appropriate extradition cases even following certification. *Garcia v. Benov*, No. CV 08-07719 (C.D. Cal. April 13, 2009) (order denying petitioner's motion for reconsideration of order denying bail). In support of its decision, the court relied on the Supreme Court's use of the words "pending examination" as an indication that the *Wright* special circumstances test applies at both the pre- and post-certification extradition stages. *Id.* This reasoning is fundamentally flawed. There is nothing in the *Wright* to indicate that the words "pending examination" were used in the post-certification context or meant to reference the Secretary of State's final surrender decision. On the contrary, as a pre-certification application for *habeas* relief following the denial of bail, *Wright's* procedural posture clearly implies that these words refer to the extradition hearing. Moreover, this reading is compelled by the Court itself by its description that "the writ was applied for in this instance *before the commissioner had entered upon the examination.*" 190 U.S. at 57. (Emphasis added). The *Garcia* court's posture that this language allows for the granting of bail after certification is thus directly contradicted by the both the factual context and the text of *Wright*.

of these two separate phases.  Thus, while *Wright* may allow for the granting of bail during the

pre-certification stage of an extradition proceeding, the post-certification stage continues to be

governed by the "shall issue" and "there to remain" language of 18 U.S.C. § 3184.

Cases that have considered bail requests after a judicial finding of extraditability

have incorrectly ignored this distinction, as well the limited applicability of the special

circumstances test to pre-certification proceedings as set forth in *Wright*.  *See, e.g. United

States v. Salerno*, 878 F.2d 317 (9th Cir. 1989) (applying special circumstances test in

considering fugitive's motion for bail during appeal of certification order); *see also Beaulieu v.

Hartigan*, 554 F.2d 1, 1-2 (1st Cir. 1977) (same); *In re Extradition of Sidali*, 899 F. Supp.

1342, 1351-52 (D.N.J. 1995).  Moreover, these cases do not indicate that the Government ever

argued that the "special circumstances" test was inapplicable after a finding of extraditability.

Thus, the language in these cases applying the special circumstances test should be deemed

dicta because "[q]uestions which merely lurk in the record, neither brought to the attention of

the court nor ruled upon, are not to be considered as having been so decided as to constitute

precedents." *Webster v. Fall*, 266 U.S. 507 (1925).

Here, special circumstances need not be entertained and were not established at

the proceedings before Magistrate Judge Falk (attached as Exhibit 13).

### 4. U.S. Foreign Interests Support Detention Of A Fugitive Post Certification

The need to maintain a fugitive without bail following certification of

extradition is further supported by the Government's interests in meeting its treaty obligations.

Specifically, the ability of the United States to deliver fugitives pursuant to extradition requests

has significant international law implications.  If the United States, as a requesting state, meets

the conditions specified in the treaty at issue, the United States expects the requested state to

extradite the fugitive. Reciprocally, if another nation meets the conditions specified in the treaty, the United States is obliged to deliver the fugitive. This obviously cannot be fulfilled if a fugitive like the Petitioner flees after being released on bond, an event that becomes more likely once a fugitive's surrender becomes more imminent. *Wright*, 190 U.S. at 62; *see also U.S. v. Leitner*, 784 F.2d 159, 160-61 (2d Cir. 1986) (the Government has an overriding foreign relations interest in complying with treaty obligations and producing extradited persons). It is important that the United States be regarded in the international community as a country that honors its agreements in order to be in a position to demand that other nations meet their reciprocal obligations to the United States. Such reciprocity would be defeated if a fugitive flees after being released on bond.

Moreover, other general considerations warranting the granting of bail to a fugitive are no longer compelling at the post-certification stages of an extradition proceeding. Following certification, the last remaining stage is the Secretary of State's decision whether or not to surrender the Petitioner. This is purely an executive function involving overriding foreign affairs considerations, an area the judiciary should be hesitant to invade. Once a fugitive is certified as extraditable in compliance with 18 U.S.C. § 3184, the Secretary of State is required to make this decision within two calendar months. 18 U.S.C. § 3188.

For the foregoing reasons, the Government respectfully requests that the Court deny the Petitioner's request for bail.

- 31 -

## **Conclusion**

The Government respectfully submits that the Court deny the Petitioner's

Petition and order that she be extradited to Costa Rica.

Respectfully submitted,

RALPH J. MARRA
Acting United States Attorney

By: Lakshmi Srinivasan Herman
Assistant United States Attorney

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing was filed on ECF this 7th day of May, 2009 to:

Michael A. Orozco, Esq.
Bailey & Orozco, LLC
744 Broad Street, Suite 1901
Newark, New Jersey 07102-3806

Harry Asatrian, Esq.
Strasser & Asatrian, LLC
744 Broad Street, 16th Floor
Newark, New Jersey 07102-3806