# BAILEY & OROZCO, LLC

### ATTORNEYS AT LAW

HOWARD W. BAILEY

MICHAEL A. OROZCO

---

### THE NATIONAL NEWARK BUILDING
### 744 BROAD STREET, SUITE 1901, NEWARK, N.J. 07102

PHONE: 973-693-4408
FAX:     973-735-2719

WEB: WWW.NJ-CRIMINALDEFENSE.COM
WWW.BOLEGAL.COM

November 3, 2008

**Via Electronic Filing**
Hon. Mark Falk, U.S.M.J.
U.S. District Court,
District of New Jersey, Newark
F. R. Lautenberg U.S. P.O. & Cthse, Rm. 457
Newark, N.J. 07102

**Re: United States v. Maria Magdalena Pacheco Bolanos**
**Mag. No. 08-3641 (MF)**

Dear Judge Falk:

Please accept this letter-brief in lieu of a more formal response to the Government's Extradition Memorandum. Ms. Bolanos challenges and asserts: (A) that the asserted evidentiary basis supporting the Extradition Petition is, wholly or in substantial part, inadmissible under the specific terms of both the Extradition Treaty between the United States and Costa Rica (Hereinafter 'Treaty'); and, the applicable evidentiary rules and laws 'of the Requested State' (B) that the unsworn 'Statement' of Giselle Rivera Chacon, Deputy Prosecutor of Cartago, Costa Rica, is itself inadmissible in this proceeding; (C) that even if the unsworn Statement of the Deputy Prosecutor is admissible as evidence, the characterizations and conclusions contained therein are not supported by essential documentation, and appear to substantially mis-categorize and mis-state the quoted evidence and are therefore nothing more than conclusory statements; (D) that under the totality of the circumstances, the admissible evidence before this Court

1

does not provide this Court with a sufficient probable cause basis to believe that Ms.

Bolanos committed the charged offense in the Country of Costa Rica, and at a minimum

the court should request additional documentation, and; (E) Mrs. Bolanos is entitled to be

released. In light of these enormous deficiencies, it is respectfully submitted that the

Government's request for certification of Ms. Bolanos' extradition must be denied and

she should be released immediately.

### A. The Evidence is Improperly Authenticated; and, is Therefore Inadmissible to Establish Probable Cause

In an extradition hearing, the evidence that can be admitted to establish probable

cause is controlled by two distinct authorities. The specific language of the Extradition

Treaty at issue; and, the statutory provisions of 18 U.S.C.§ 3190, which states that

competent evidence consists of:

> Depositions, warrants, or other papers or copies thereof offered in evidence upon the hearing in any extradition case shall be received and admitted as evidence on such hearing for all the purposes of such hearing  if  they  shall  be properly and legally authenticated as to entitle them to be received for similar purposes by the tribunals of the foreign country from  which the accused party shall have escaped, and the certificate of the principal diplomatic or consular officer of the United States resident in such foreign country shall be proof that the same so offered, are authenticated in the same manner. 18 U.S.C. § 3190. (June 25, 1948, c.645, 62 Stat. 824)

In the present matter, the Government has provided the Court with certifications,

by the Consul General of the United States Embassy to Costa Rica, David R. Dreher; and,

by Heather K. McShain, Attorney Advisor, Office of the Legal Advisor, Department of

State. The certification of David R. Dreher contains a specific reference to the evidentiary

materials attached to the extradition materials, as being duly authenticated in accordance

2

with the provisions of § 3190. With this authentication, which complies with § 3190, the Court is provided with a basis to evaluate whether the proffered evidentiary items actually establishes a sufficient probable cause basis to support a finding of extraditability. In the present case however, § 3190 is not the applicable standard for evaluating the sufficiency of the submitted documentation.

Mr. Dreher's authentication pursuant to § 3190 only establishes that the proffered evidence would be legally proper, in the form proffered, and acceptable to *"be received for similar purposes by the tribunals of the foreign country from which the accused party shall have escaped."* Id. (Emphasis added). As long as there is no specific language in the applicable treaty, such an authentication would constitute, pursuant to the statute, a basis for this Court to decide whether probable cause existed and, if appropriate, to issue an Order of Extradition. Where however, the applicable treaty contains supplemental authentication requirements, those requirements must also be complied with by the "Requesting State". In <u>Barapind v. Enomoto</u>, 400 F.3d 744 (9th Cir. 2005), the Court specifically noted the applicable treaty did not contain any supplementary authentication requirements, which left the Court with only the requirements of § 3190 to consider. <u>Enomoto</u>, 400 F.3d at 748.

The Treaty between the United States and Costa Rica, which became effective October 11, 1991, contains a specific provision pertaining to the procedures and documents required in order to perfect an extradition petition for consideration by the Court. Specifically, Article 9 of the Treaty states (in pertinent part):

> (4) When the request for extradition relates to a person who has not yet been convicted, it [the request for extradition] shall be accompanied by: (a) A copy of the charging document, or an equivalent document issued by a

3

> judge...and (b) Such evidence, as in accordance with the
> laws of the Requested State, would be necessary to justify
> the apprehension and commitment for trial of the person
> sought if the offense had been committed there.

In Greci v. Birknes, 527 F.2d 956 (1st Cir. 1976), the Court was confronted with a

similar situation, where the treaty at issue, which was adopted after the effective date of §

3190, contained a supplemental provision requiring that the supporting documentation

there meet the standards of the Treaty provision at issue in that case, which stated

> "Extradition shall be granted only if the evidence be found
> sufficient, according to the laws of the requested Party...to
> justify his committal for trial if the offense of which he is
> accused had been committed in its territory..." Id. 527 F.2d
> at 958.

The Birknes Court reversed the order of extradition which had been issued by the

magistrate, after the magistrate had made a finding that the evidence admitted in the

extradition proceeding, pursuant to § 3190, was sufficient to justify the extradition. The

Birknes Court remanded the matter with directions that the magistrate discharge the

petitioner (Greci) within 45 days, unless within that time period the magistrate was

presented with sufficient competent evidence, comporting with the supplemental

provisions of the Treaty, and based upon that competent evidence then issued a

certification of Greci's extradition.

In regards to the issue of which provision will control, the statutory language or

the language of the treaty, the Court clearly enunciated that

> By the Constitution a treaty is placed on the same footing,
> and made of like obligation, with an act of legislation. Both
> are declared by that instrument to be the supreme law of the
> land, and no superior efficacy is 18 USC §3060given to either over the other. When the two relate to the
> same subject, the Courts will always endeavor to construe
> them so as to give effect to both, if that can be done without

4

> violating the language of either; but if the two are inconsistent, the one last in date will control the other...<u>Birknes</u>, 527 F.2d at 960.

Clearly, the 'authentication' by Mr. David R. Dreher does not address the admissibility of the supporting documentation in the 'Requested Country', as set forth in the specific language of the Treaty.

Since the proffered evidential basis does not comport with the required 'authentication' that it would be admissible in the Courts of either New Jersey or, the Federal District Court, the evidential basis is deficient and improperly authenticated. Respectfully, as such, this Court should deny the certificate of extradition, and release Ms. Bolanos from further response to this petition until such time as a properly 'authenticated' and admissible evidential basis is provided to the Court in support of the petition.[1]

## B. The Statements of the Deputy Prosecutor are Incompetent as Evidence; and, are therefore Inadmissible to Establish Probable Cause

Ms. Bolanos concedes, as a general proposition, that hearsay evidence is admissible at an extradition proceeding. <u>Quinn v. Robinson</u>, 783 F.2d 776, 815 (9th Cir. 1986); <u>Enami v. U.S. Dist. Ct.</u>, 834 F.2d 1444, 1451 (9th Cir. 1987). In an extradition proceeding, competent evidence is limited by both the terms of 18 U.S.C. § 3190; and, if set forth therein, by the explicit terms of an extradition treaty. <u>Greci v. Birknes</u>, 527 F.2d 956 (1st Cir. 1976); <u>Zanzanian v. United States</u>, 729 F.2d 624 (9th Cir. 1984). In this regard, Article 9 of the Treaty explicitly states that the evidence supporting the extradition petition, must comport with the 'laws of the Requested State' and be

---

[1] Mrs. Bolanos argues for her immediate release and that argument is addressed at the end of the brief.

5

sufficient to justify the apprehension and commitment for trial of the person charged, as if the offense had been committed there.

American courts have not always agreed upon the meaning to be applied to "the laws of the place where the fugitive is found" (in reference to the Treaty language cited above "...in accordance with the laws of the Requested State..."). In some cases, this type of language has been interpreted to require that the evidence must be sufficient to authorize arrest and commitment for trial in accordance with the law of the state where the fugitive is found. Petite v. Walshe, 194 U.S. 204, 217 (1904). In other, more recent cases, Courts have defined this phrase to mean federal law. Enami, 834 F.2d. at 1450-51 (9th Cir. 1987). Since this matter is being heard in the District Courts, in New Jersey, I address both the State and the Federal standards in this regard.

In regards to the applicable standards under New Jersey State law, probable cause determinations are governed by the New Jersey Rules of Evidence. Evidence Rule 101 (a)(2)(D), states (in pertinent part):

> (2) Court Proceedings; relaxation. These rules of evidence shall apply in all proceedings, civil or criminal, conducted by or under the supervision of a court. Except as provided in paragraph (a)(1) of this rule, these rules may be relaxed in the following instances to admit relevant and trustworthy evidence in the interest of justice.
> (D) to the extent permitted by law, proceedings to establish probable cause, including grand jury proceedings, probable cause hearings, and *ex parte* applications.

In addition, New Jersey Rule of Evidence 603 mandates that all witnesses be sworn, stating (in pertinent part), "[b]efore testifying a witness shall be required to take an oath or make an affirmation or declaration to tell the truth under the penalty provided by law."

6

While hearsay is permissible in a grand jury proceeding, the witness that testifies to the hearsay must do so under oath and penalty of perjury. Ms. Bolanos is not aware of any case since the enactment of N.J.R.E. 603 that has permitted a grand jury indictment in New Jersey to proceed on the basis of unsworn testimony.

Even the issuance of a criminal complaint requires both a factual basis and that the factual basis be attested to by either oath or certification. New Jersey Court Rule 3:2-1 states "[t]he complaint shall be a written statement of the essential facts constituting the offense charged…by certification or on oath."

Where an arrest warrant is being issued, New Jersey Court Rule 3:2-3(b) states that

> A judge may issue an arrest warrant on sworn oral testimony of a law enforcement applicant…The judge shall administer the oath to the applicant…the applicant must identify [themself], and read verbatim the Complaint-Warrant…and any supplemental affidavit that establishes probable cause for the issuance of the arrest warrant.

Similarly, Rule 3 of the Federal Rule of Criminal Procedure requires that "[t]he complaint is a written statement of the essential facts constituting the offense charged. It must be made under oath…"

In this Extradition Proceeding, the translated statements of Giselle Rivera Chacon, Deputy Prosecutor of Cartago; and, of the Trial Court of Cartago (which merely recites information attributed to the Prosecutor's Office) are not made in the form of a sworn statement. There is no authentication of the information contained therein, that meets any evidentiary standard, whether New Jersey, Federal, or Costa Rican. The "statements" are merely certified (not authenticated as meeting any evidentiary standard) by Consul

7

General of the United States Embassy to Costa Rica, David R. Dreher; and, by Heather

K. McShain, Attorney Advisor, Office of the Legal Advisor, Department of State, who

themselves have no knowledge of the facts underlying the charges that pertain to this

extradition request, or apparently, whether the 'evidence' meets the applicable statutory

or evidentiary standards of the law, whether New Jersey, Federal, or Costa Rican.

The same arguments apply if this Court interprets the phrase "...in accordance

with the laws of the Requested State..." to mean federal law. The Federal Rules of

Evidence permit the introduction of hearsay in the grand jury or at a preliminary hearing.

F.R.E. 1101(d)(3). In addition, every witness offering testimony in federal court is

required to declare, by oath or affirmation, that the testimony is true. F.R.E. 603.

Since the Treaty requires that a finding of probable cause be governed "...in

accordance with the laws of the Requested State..." any evidence that is not in the form

of a sworn statement and under penalty of perjury cannot be admitted to support a finding

of extradictability. C.F., Enami, 834 F.2d. at 1451; and, Platko, 213 F.2d at 1237. Since

the statements of the prosecutor and the court are not sworn to under penalty of perjury,

or asserted to be based upon personal knowledge which could be testified to in Court,

they are not admissible as evidence during the extradition proceeding. In addition, the

translated petition and the supporting documents to the extradition petition, do not

contain any references to **an admission or statement by Ms. Bolanos,** which could be

credited as otherwise establishing a self-incriminating statement as a basis for this court

to find probable cause.

This honorable court has the power and authority to grant the respondent the

ability to produce witnesses in a preliminary hearing. See Coleman v. Burnett, 477 F. 2d

8

1187 (1973).  The respondent would like to bring forth and elicit the testimony of Fernando Sánchez Chacón, a licensed attorney from Costa Rica who has been responsible for respondent's matters and numerous arguments before Costa Rican courts pre-dating her arrest as well as numerous submissions to Costa Rican authorities since her arrest. Respondent proposes that the testimony to be elicited would be limited to the sufficiency of the 'evidence' proffered by Costa Rica in this hearing.  This office formally requests that His Honor grant this application in anticipation of bringing Mr. Chacon from Costa Rica.

### C. Even if the Court finds that the Statements of the Prosecutor and the Costa Rican Court are Admissible, they fail to set forth a sufficient basis to establish probable cause

The Statement of the prosecutor (and the court which is clearly based upon information provided to the court by the prosecutor's office) contains numerous instances of information, stated as facts, without any reference to the evidentiary basis or source for the asserted "fact".  At best, these statements by the Costa Rican prosecutor are conclusory, and at worst, are a deliberate mis-statement of the actual statements of the witnesses and a blatant attempt to mislead this court. Under either analysis, the witnesses statements do not state what the Costa Rican prosecutor indicates that the say, and cannot therefore be used to satisfy the probable cause basis to support this extradition request.

In order to establish that the prosecutor's statements are conclusory, Ms. Bolanos has submitted the translations of sworn statements given to the Costa Rican authorities by Mariano Sandoval Rodriguez, Martin Carvajal Villalobos and Juan Carlos Stellar.  Each one of these sworn witness statements is actually referenced in the prosecutor's statement (although not attached as documentary support for the petition); and, is the only basis that

9

the Costa Rican authorities can and in fact do use to support their conclusory statements regarding Ms. Bolanos' involvement. Specifically, in addition to other conclusory mis-statements allegedly supported by the witnesses statements, in paragraphs 3, 4, 5, 10, 11, 12, 13, 14, 15, and 16, respectively, the Costa Rican prosecutor alleges as facts that Ms. Bolanos was told of the plan (paragraph 3), that she agreed to the plan (paragraphs 4 and 5), that Ms. Bolanos was the person who arrived at the scene of the attempted murder (paragraph 10), entered the house and helped to restrain the decedent (paragraph 11), and that she later took part in the threatening, beating and transportation of the victim along with an as yet "unidentified person" (paragraphs 12 through 16). As stated above, these statements were not attached to the petition as served upon counsel for Ms. Bolanos, nor was any translation of these statements provided to support the petition

Attached to this brief as Exhibit A through C, are copies of the official statements of Martin Villalobos with a certified translation into English (Exhibit A); of Mariano Rodriguez with a certified translation into English (Exhibit B); and, of Juan Vargas with a certified translation into English (Exhibit C). These statements are the referenced evidence offered by Costa Rica to establish probable cause. The English translations attached to each statement were obtained through the services of a translator certified to provide such services before New Jersey Federal District Court. Exhibit A contains a true and accurate copy of the sworn statement and certified translation of Mr. Martin Villalobos. As evidenced by the certified translation, the only alleged reference to a woman arriving at the 'scene' occurs when the witness is leaving the location. No identification of the arriving woman occurs, other then to indicate she seemed 'mannish'. Not only does the witness not identify the 'woman', the statement provides no description

10

as to the race, age, build, or any other identifying characteristic from which an identification could be developed or compared. In fact, based upon the actual statement, the 'woman' – who is described as being 'mannish' – could actually have been the other 'unidentified' person referred to in the prosecutor's statement, and could have been a man dressed as a woman. According to the prosecutor's mis-statement of the facts, this 'woman' is Ms. Bolanos. Obviously, he either is relying upon some other source of information for that 'fact', or he is completely mis-stating the truth and the facts of his case. Simply stated, this particular evidence fails to support any identification of who that 'woman' was, let alone provide an identification of the 'woman' as being Ms. Bolanos.

Exhibit B contains a true and accurate copy of the sworn statement and certified translation of Mr. Mariano Rodriguez, who was present with the declarant of Exhibit A Again, no identification is made of Ms. Bolanos, rather, the declarant states that he observed the arrival of a car driven by a 'fair-haired woman'. No other description is given as to race, age, build, or any other identifying characteristic from which an identification could be developed or compared. According to the prosecutor's mis-statement of the facts, this 'woman' is Ms. Bolanos. Obviously, he either is relying upon some other source of information for that 'fact', or he is completely mis-stating the truth and the facts of his case. Simply stated, this particular evidence fails to support any identification of who that 'woman' was, let alone provide an identification of the 'woman' as being Ms. Bolanos.

In addition to the noted failures of the declarant of Exhibit A or B to identify the 'woman' as being Ms. Bolanos, it should also be noted that neither declarant in Exhibit A or Exhibit B saw the 'woman' get out of the vehicle or go into the house. It should also

11

be noted that there are no other alleged witnesses or statements attached to the extradition petition to support an identification of Ms. Bolanos as having been present at the scene – before, during or after the incident. Obviously, the prosecutor is either mis-stating the facts, or is relying upon some other source of information not attached to, or referenced in, the petition. These defects therefore call into question the veracity of the Costa Rican prosecutor as to all of his other 'conclusions' used to support the extradition petition Unfortunately, since the information relied upon by the Costa Rican Court was provided by the prosecutor, it also calls into question the basis upon which that Court issued the extradition request.

Exhibit C contains a true and accurate copy of the sworn statement and certified translation of Mr. Juan Vargas, who states that two or more weeks earlier – on a date he did not remember - he saw and heard some fighting between three men, and that a woman was there leaning against a car. The woman was described as 'mannish' and 'somewhat slender or normal height'. The location of the 'fighting' incident is not clearly stated by the declarant. Most significant, is the fact that this statement contains no indication by the witness as to who the woman was, let alone a positive identification of Mrs. Bolanos as being that woman. The Costa Rican prosecutor, instead of providing the court with an accurate interpretation of what the witness actually said, 'interprets' this non-identification into an identification by his conclusory statement that it was Mrs. Bolanos. (See the Costa Rican prosecutor's conclusions identifying the woman in this indent as Ms. Bolanos in paragraphs 15 and 16). Either the Costa Rican prosecutor mis-stated what the proofs actually were in this regard, or the prosecutor is relying upon some other source of information not attached to, or referenced in, the extradition petition.

Alternatively, it is a deliberate attempt by the Costa Rican prosecutor to mislead this court as to the sufficiency of the proofs supporting the Costa Rican extradition request.

The Federal Courts have dealt with similar issues in extradition proceedings where the Requesting State has submitted weak evidence. See U.S. v. Barr, 619 F. Supp. 1068, 1017 (1985). "Probable cause means more than opportunity to commit crime or presence in a particular place. It must be more than surmise or suspicion. There must be some tangible fact or incident which will support a judicial act, something which invokes discrimination of judicial discretion." Ibid.; see also, Reis v. United States Marshal, 192 F. Supp. 79, 82 (E.D. Pa. 1961) (quoting United States v. Johnston, 292 F. 491 (493 (D. Wash. 1923)). In the instant matter the Requesting State's evidence is even weaker than Barr, as Costa Rica only suspects presence, and offers not one piece of solid, tangible evidence to prove same. The translated statements reveal no positive identification, and her presence alone still would not amount to sufficient probable cause.

Exhibit D is a true and accurate copy of the official Costa Rican autopsy report of the decedent's autopsy, along with a certified translation of the autopsy report. The report clearly indicates that the decedent, Mr. Borrase, died as a result of gun shot wounds. The autopsy report contains no information to support any of the conclusory statements made by the Costa Rican prosecutor. Specifically, the autopsy contains no reference to indicate that Mr. Borrase bore the marks of having been 'shocked' with any kind of 'stun gun' or electric shock, or had been rendered incapacitated by a 'stun gun'.

At an extradition hearing as in other situations requiring a probable cause basis, probable cause means that the facts and circumstances are rationally sufficient to support

13

a person of reasonable caution in the belief that an offense has been committed. As stated by the Supreme Court,

> The commissioner must judge for himself the persuasiveness of the facts relied upon by a complaining officer to show probable cause. He should not accept without question the complainant's mere conclusions that the person whose arrest is sought has committed a crime"
> Lehming, 951 F. Supp. at 514.

Even if the Court admits the witnesses' statements, the reasonable inferences which can be drawn from those statements do not provide a sufficient probable cause basis to establish that Ms. Bolanos was involved in the planning of the crime, present at the crime scene, or involved in the commission of any crime. Essentially the only 'evidence' presented by Costa Rica that actually supports the extradition petition are the 'conclusions' of their prosecutor, based upon his 'interpretation' of the actual facts. The petition is therefore based upon nothing more than "mere suspicion or bare conclusions."

While it is true that the Court may only receive evidence that explains the evidence introduced by the demanding country; and, that the accused has no right to present evidence calculated to contradict the demanding country's proof or to pose questions of credibility. Collins v. Loisel, 259 U.S. 309, 315-16, 42 S.Ct. 469, 66 L.Ed. 956 (1922); Shapiro v. Ferrardina, Supra, 478 F.2d at 901. The undersigned has located no case which precludes this Court from reviewing the actual facts relied upon by Costa Rica, factually stated, and without the mis-statements or conclusions of Costa Rica's prosecutor. Having reviewed that evidence, this Court must evaluate it to determine that the presented evidence actually establishes a sufficient factual probable cause basis for the extradition petition.

Pursuant to the language of the Treaty, at the hearing of this matter, the evidence submitted by the Government in support of the extradition petition must be established to be both competent; and, sufficient, to support the issuance of an arrest warrant under the laws, rules and procedures applicable to criminal prosecutions in the United States. See Birknes, 527 F.2d at 960, *citing* Iriarte v. United States, 157 F.2d 105, 108 (1st Cir. 1946), *cert. denied*, 335 U.S. 816, 93 L. Ed. 371 (1948); and, Whitney v. Robertson, 124 US 190, 194, 31 L. Ed. 386 (1888).

An accused person's right to produce evidence at an extradition hearing is limited. The rule is that the accused has no right to introduce evidence which merely contradicts the demanding country's proof, or which only poses conflicts of credibility. On the other hand, the accused has the right to introduce evidence which is "explanatory" of the demanding country's proof. The extent of such explanatory evidence to be received is largely in the discretion of the judge ruling on the extradition request. Collins v. Loisel, 259 U.S. 309, 315-17, 42 S.Ct. 469, 66 L.Ed. 956 (1922); Charlton v. Kelly, 229 U.S. 447, 461, 33 S.Ct. 945, 57 L.Ed. 1274 (1913); United States ex rel. Petrushansky v. Marasco, 325 F.2d 562, 567 (2d Cir. 1963), cert. denied, 376 U.S. 952, 84 S.Ct. 969, 11 L.Ed.2d 971 (1964).

The distinction between "contradictory evidence" and "explanatory evidence" is difficult to articulate. However, the purpose behind the rule is reasonably clear. In admitting "explanatory evidence," the intention is to afford an accused person the opportunity to present reasonably clear-cut proof which would be of limited scope and have some reasonable chance of negating a showing of probable cause. The scope of this evidence is restricted to what is appropriate to an extradition hearing. The decisions are

15

emphatic that the extraditee cannot be allowed to turn the extradition hearing into a full trial on the merits. Respectfully, Ms. Bolanos is not turning this hearing into a full trial, and is only demanding that the United States, require that Costa Rica produce sufficient, actual, certifiable evidence that warrants a finding of probable cause.

The Supreme Court has twice cited with approval a district court case which aptly summarizes the relevant considerations. The Supreme Court decisions are <u>Collins v. Loisel</u>, 259 U.S. 309, 316, 42 S.Ct. 469, 66 L.Ed. 956 (1922), and <u>Charlton v. Kelly</u>, 229 U.S. 447, 461, 33 S.Ct. 945, 57 L.Ed. 1274 (1913). Recent decisions such as <u>Sindona</u>, 450 F. Supp. 672, establish that a judge presiding over an extradition hearing is to consider the sufficiency of the evidence presented and decide that a lack of evidence renders any statements conclusory. In this instant matter, not one piece of evidence has been forwarded, translated, certified, or provided. Thus, every statement offered is, for all intents and purposes, at best, conclusory.

18 USC Section 3184 controls internal extradition proceedings as so far as they address the sufficiency of evidence. Section 3184 states:

> Whenever there is a treaty or convention for extradition between the United States and any foreign government, or in cases arising under <u>section 3181(b)</u>, any justice or judge of the United States, or any magistrate judge authorized so to do by a court of the United States, or any judge of a court of record of general jurisdiction of any State, may, upon complaint made under oath, charging any person found within his jurisdiction, with having committed within the jurisdiction of any such foreign government any of the crimes provided for by such treaty or convention, or provided for under <u>section 3181(b)</u>, issue his warrant for the apprehension of the person so charged, that he may be brought before such justice, judge, or magistrate judge, to the end that the evidence of criminality may be heard and considered. Such complaint may be filed before and such warrant may be issued by a judge or magistrate judge of the

16

United States District Court for the District of Columbia if the whereabouts within the United States of the person charged are not known or, if there is reason to believe the person will shortly enter the United States. If, on such hearing, he deems the evidence sufficient to sustain the charge under the provisions of the proper treaty or convention, or under section 3181(b), he shall certify the same, together with a copy of all the testimony taken before him, to the Secretary of State, that a warrant may issue upon the requisition of the proper authorities of such foreign government, for the surrender of such person, according to the stipulations of the treaty or convention; and he shall issue his warrant for the commitment of the person so charged to the proper jail, there to remain until such surrender shall be made.

See also, Republic of France v. Moghadam, 617 F. Supp. 777, 781 (1985). A judge presiding over an extradition hearing should also rely upon 18 USC §3060 for further guidance in analyzing the sufficiency of the evidence as well as to decide issues of admissibility and the extraditee's request to use evidence and present witnesses and testimony. The statue states:

(a) Except as otherwise provided by this section, a preliminary examination shall be held within the time set by the judge or magistrate judge pursuant to subsection (b) of this section, to determine whether there is probable cause to believe that an offense has been committed and that the arrested person has committed it. (b) The date for the preliminary examination shall be fixed by the judge or magistrate judge at the initial appearance of the arrested person. Except as provided by subsection (c) of this section, or unless the arrested person waives the preliminary examination, such examination shall be held within a reasonable time following initial appearance, but in any event not later than--

(1) the tenth day following the date of the initial appearance of the arrested person before such officer if the arrested person is held in custody without any provision for release, or is held in custody for failure to meet the conditions of release imposed, or is released from custody only during specified hours of the day; or

17

(2) the twentieth day following the date of the initial appearance if the arrested person is released from custody under any condition other than a condition described in paragraph (1) of this subsection.

(c) With the consent of the arrested person, the date fixed by the judge or magistrate judge for the preliminary examination may be a date later than that prescribed by subsection (b), or may be continued one or more times to a date subsequent to the date initially fixed therefor. In the absence of such consent of the accused, the judge or magistrate judge may extend the time limits only on a showing that extraordinary circumstances exist and justice requires                  the                  delay.

(d) Except as provided by subsection (e) of this section, an arrested person who has not been accorded the preliminary examination required by subsection (a) within the period of time fixed by the judge or magistrate judge in compliance with subsections (b) and (c), shall be discharged from custody or from the requirement of bail or any other condition of release, without prejudice, however, to the institution of further criminal proceedings against him upon the      charge      upon      which      he      was      arrested.

(e) No preliminary examination in compliance with subsection (a) of this section shall be required to be accorded an arrested person, nor shall such arrested person be discharged from custody or from the requirement of bail or any other condition of release pursuant to subsection (d), if at any time subsequent to the initial appearance of such person before a judge or magistrate judge and prior to the date fixed for the preliminary examination pursuant to subsections (b) and (c) an indictment is returned or, in appropriate cases, an information is filed against such person      in      a      court      of      the      United      States.

(f) Proceedings before United States magistrate judges under this section shall be taken down by a court reporter or recorded by suitable sound recording equipment. A copy of the record of such proceeding shall be made available at the expense of the United States to a person who makes affidavit that he is unable to pay or give security therefor, and the expense of such copy shall be paid by the Director of the Administrative Office of the United States Courts.

18 USC §3060. See also, Sindona v. Grant, 619 F. 2d 167 (2d. Cir. 1908). The

evidence submitted and relied upon by the Government is insufficient to support a

18

finding of probable cause with regard to Ms. Bolanos' alleged involvement in the homicide of Jose Borrase Taylor in Costa Rica. When evaluating the probable cause proffered by the Government, the Court

> "...is to review the evidence presented and make an independent determination that the accused committed the crimes alleged. As stated by the Supreme Court, 'the commissioner must judge for himself the persuasiveness of the facts relied upon by a complaining officer to show probable cause. He should not accept without question the complainant's mere conclusions that the person whose arrest is sought has committed a crime."

In the Matter of The Extradition of Gunther Lehming, 951 F. Supp. 505, 514 (D. Del. 1996).[2] In essence, the standard for the court's determination is identical to the standard under Federal Rule of Criminal Procedure 5.1 (e). United States v. Atur, 300 F. Supp. 2d 418, 426 (S.D. W.Va. 2003). (Citations omitted). A magistrate judge sitting in an extradition case reserves the sole right to determine the credibility, if any, of the Government's evidence. Quinn v. Robinson, 783 F.2d 776, 815 (9th Cir. 1986); cert. denied, 476 U.S. 882, (1986).

Competent evidence for probable cause in the extradition context is not the same quantum of evidence required to convict. In the matter of the Extradition of Platko, 213 F. Supp. 2d 1229, 1237 (S.D. Cal. 2002), (citing, Fernandez v. Phillips, 268 U.S. 311, 312 (1925). When reviewing the probable cause basis underlying an extradition petition, the Court is required to determine if the evidence proffered by the Government is, both legally competent under the applicable standard; and, if it is, whether it is sufficient to

---

[2] It should be noted that due to the deficiency in the supporting Probable Cause, the Lehming Court did not issue a certificate of Extradition to the Secretary of State. What is of greater weight for the arguments contained in this brief is that the court in Lehming found that the 'evidence' submitted by the requesting state amounted to "unsupported conclusory statements which are insufficient to satisfy probable cause." Lehming at 517.

19

establish the requisite probable cause basis to support the petition. In the instant matter, the Government's evidence against Ms. Bolanos consists of an unsworn, uncorroborated series of statements by the Prosecutor, narrating an alleged chain of events; the conclusions and inferences of Giselle Rivera Chacon, Deputy Prosecutor of Cartago, Costa Rica drawn from those unsworn and uncorroborated statements; and, a list of purported testimonial and documentary 'evidence', none of which is attached to the extradition petition.

In essence the Government contends that the combination of these conclusory statements three elements creates a reasonable inference that Ms. Bolanos was a participant in the alleged crime of homicide. (See, Articles 111 and 112 of the Costa Rican Penal Code, which makes Aggravated Homicide a crime, punishable by imprisonment for a period between twenty and thirty-five years). As discussed below, the evidence relied upon as support for the Extradition Petition is largely inadmissible; and, even if admissible does not establish a reasonable probable cause basis to conclude that Ms. Bolanos was involved in the alleged offense. Therefore, the application for certification of Ms. Bolanos' extradition should be denied; and, Ms. Bolanos should be discharged forthwith and the case closed.

### D. This court has the authority under the subject treaty to request additional documents from the requesting State.

As previously stated, the evidence that can be submitted is controlled by the Extradition Treaty. Under the Treaty this court has the authority to order additional documentation from the requesting State if it finds that the request does not fulfill its requirements. Article 10 of the Treaty states:

**Additional documentation.** (1) If the Requested State considers that the documents furnished in support of the request for the extradition of a person sought are not sufficient to fulfill the requirements of this Treaty, that State shall request the submission of necessary additional documents. The Requested State may set a time limit for the sunmission of such documents, and may grant a reasonable extension of the time limit upon application of the Requesting State setting forth reasons therefore. (2) If the person sought is in custody and the additional documents submitted are not sufficient, or if such documents are not received within the period specified by the Requested State, that person may be discharged from custody. Such discharge shall not prejudice the re-arrest and the extradition of the person if the additional documents are subsequently received.

This office is humbly requesting that, based upon the issues raised by the respondent's attorneys, this court should require the Requesting State to produce, at a minimum, actual evidence to support their contention and satisfy the probable cause requirements. Indeed, numerous courts have held that where the Requesting State has not produced evidence to sustain a finding of probable cause, the extradition request shall be denied. See Republic of France v. Moghadam, 617 F. Supp. 777 (1985); U.S. v. Barr, 619 F. Supp. 1068 (1985).

In the instant matter it is conceded that, pursuant to Article 9 of the applicable Treaty the request for extradition contains most of the following requirements:

(a) Information concerning the identify of the person sought and the location where the person may be found...and
(b) A brief statement of the facts of the case.
(3) the request for extradition **shall be accompanied by documents which contain**:
(a) a detailed explanation of the pertinent facts of the case;
(b) Evidence that the person sought is the person charged or convicted;
(c) The text and an explanation of the law describing the offenses and the penalties therefore; and

21

(d) the text and an explanation of the law setting forth the statute of limitations applicable to the trial and punishment therefore.

(4) When the request for extradition relates to a person who **has not yet been convicted, it shall be accompanied by**

(a) A copy of the charging document, or an equivalent document issued by a judge or judicial authority; and

(c) such evidence, as in accordance with the laws of the Requested State, would be necessary to justify the apprehension and commitment for trial of the person sought if the offense had been committed there.

It is argued here, that under section 4 of the aforementioned Article, the Requesting State has failed, completely, to meet the requirements under sub-section (b). It is under subsection (b) that the Requesting State has failed to produce the necessary evidence that would satisfy the finding of probable cause under US law because she has not yet been convicted.[3]

### E. Based Upon the Aforementioned Arguments and the Fact that the Requesting State has Failed, Utterly, to Produce Any Reliable Evidence We Request that She Be Set Free.

Mrs. Bolanos submits as **Exhibit E** a copy of a report proffered by Nancy Kahn, a licensed social worker who has had the opportunity to interview her and her family. As evidenced by her incarceration for the past 8 months, her family has endured great pain and tragedy. The State has utterly failed to produce one piece of evidence which rises to a showing of probable cause to arrest and extradite Mrs. Bollanos.

Where there are special concerns as outlined above this court may demand a heightened level of scrutiny in the interests of justice. Republic of France v. Moghadam, 617 F. Supp. 777, 783 (1985). In the instant matter, if extradition is granted, Mrs. Bolanos will most likely never be allowed to re-enter the United States where her

---

[3] Though it has not been submitted as explanatory evidence, we inform that court that this office is in possession of Interpol arrest arrests which state that Mrs. Bolans was convicted and awaiting a ten year sentence. Such is not the case.

husband and family reside. "The harsh results of an erroneous extradition based on untrustworthy accusations militate against [a court] applying too lenient a standard of review in determining probable cause." Id. at 784. Just as in Moghadam, the evidence presented by the Requesting State has been explained away due to its ambiguous nature and clearly conclusory statements. We humbly argue that the evidence offered by Mrs. Bolanos has been explanatory in nature, therefore is to be considered by Your Honor, and obliterates any finding of probable cause.

If released this office understands that the matter will still need to be referred to the US Immigration courts, but certainly that should not affect Your Honor's decision as far as the arguments contained herein attacking probable cause and the credibility of the 'evidence' submitted. We therefore, and humbly, request her release from custody.

## WHEREFORE

Ms. Bolanos respectfully asks that this court find that Probable Cause is lacking; that the Costa Rica Government's application for certification of Ms. Bolanos' extradition be denied and that she be released forthwith.

Respectfully submitted,

Howard W. Bailey, Attorney of Record and on the Brief

Michael Orozco, On the Brief

cc:     Lakshmi Herman

23

# EXHIBIT A

WITNESS STATEMENT OF:  MARTIN FEDERICO CARVAJAL VILLALOBOS.

SECOND PRELIMINARY COURT OF CARTAGO, at nine hours and forty

minutes,on December the fourth,nineteen ninety seven.

Appearing in these chambers there is a witness, who has been

appr·ised by the undersigned (female) Judge,and informed of the

penalties with which the law punishes perjury and false testi-

mony, as well as slanderous charges in criminal matters. He

swears to tell the truth.  IDENTIFICATION OF THE WITNESS:

NAME:  MARTIN FEDERICO CARVAJAL VILLALOBOS.

AS KNOWN AS:  HE IS NOT KNOWN BY ANY OTHER NAME NOR NICKNAME,

BUT HE BE LOCATED VIA BEEPER 296-26-26.  CODE 900-348

34 YEARS OLD.

NATIONALITY:  Costarrican

MARITAL STATUS:  married

OCCUPATION:  PRIVATE INVESTIGATOR.

LOCATION AND ADDRESS OF EMPLOYER:  HE HAS NO FIXED WORK

LOCATION NOR OFFICE. HE STATES THAT HE WORKS THROUGHOUT THE

COUNTRY.

SON OF:  FEDERICO CARVAJAL ALVAREZ AND  MARIA RITA VILLALOBOS

JIMENEZ. FATHER: DECEASED.   MOTHER (LIVES AT) BARRIO SAN

MARTIN, SAN SEBASTIAN, SAN JOSE.

CURRENT ADDRESS: Hatillo two, del Brenes Mesen, seventy five

meters east, Alameda seven, Unit number 796, white with black

railings, and cement.

He is customarily interrogated a) about the events under

investigation.The declarant STATES:  I do not know the parties

in this matter. On Tuesday,November eighteenth of this year,

FRANCIS TEJADA BARRANTES, Esq. called us both,MARIANO  and
myself via the Beeper to let us know that he had an assignment
for us. We know Mr. Tejada because he was my boss when I
worked for U.P.D. He first called Mariano via his Beeper
and Mariano told me that he had an assignment for us.
We went to lunch and we then reported to Central Park of San
Jose at four thirty in the afternoon. We met with Francis who
told Mariano, Alfredo and myself about following the wife of
one of his clients. He did not mention the client's name,
but he did tell us that we should wait for him and he did
show up at five in the afternoon. He got out of a two door
dark red sports car, with polarized (tinted?) windows, of
an unknown make and when he approached us, Mr Francis
introduced him to us. Before he arrived, Mr.Francia had
commented (to us) that he wanted his wife followed because
-apparently- she was being unfaithful, but, he said it would
be better if we waited for him to tell us (directly). When
the gentlemanapproached us, and was intr oduced, he asked
us to enter the same vehicle that I just described, but I
told him (that) we had a car with us,so we should follow him
instead.However, he told us that since it was three of us,two
of us should go with him and the third one should follow. We did
do that, so Mariano and I got into his car,with Mariano in
the back seat, and myself in the front passenger side. I
asked him where were we going, for Alfredo to follow us
and he said "To Roble,in Lourdes" So we went through San Jose
via Second Avenue.There was a lot of (traffic) congestion
down the Rotonda de la Hispanidad, so when we passed our

associate, we lost him in traffic, and we arrived at five
forty at Mr. Francis client's house, meaning Laureno.
Mariano asked to use the facilities, and I went with
Mr. Montero to a room with a computer, which he turned on
and started to use. He was about to take out something from
an attache case that he had in his car, and did do that
when we got out.I assumed it would be a diskette, but, in
reality, it turned out to be a black,rectangular contraption,
with two metal prongs on the one end, which I know to be an
electric plug, and he asked me to hand him another plug
sitting on top of the "planchador" itself that fits on a
battery casing. I handed it to him. The batteries were out.
Before Mariano had come out of the bathroom, he asked me to
tell him about the type of work we do; I told him thst we do
assignments locating people, vehicle seizing, tailing
people in infidelity situations. It was then that Mariano
came out of the bathroom. I did ask him and once I had come
out of the bathroom,   Mr Montero was still on the computer,
which he turned away from. He went towards the bathroom, which
he repeated again several times. On one of those times, when
he came out, I noticed he had changed his clothes, because I
saw he had a sweater on, but he still was not telling us why
he had sought us. On one of those many ocasions when he went
to the bathroom, while Mariano and I stayed on our own, I was
able to hear the sound of somebody upstairs , that is to say
sounds of steps coming from the second floor, while we were

downstairs, on the first floor. When he came out of the
bathroom, I asked him whether there was anybody else in the
house. He said: "No, relax" I mentioned to Mariano:" How
strange that he doesn't want to approach the subject", and
we went to the living room. While we were in the living room,
he asked us: "Do you think that a woman thst one keeps (living)
at a house like this could try to cheat on you?" I answered
"yes, because it is not the first time that I get to work on
this type of job,"and I even commented about a case I had
investigated. I got the impression that he was "buying time",
as if he was waiting for something or somebody. While we were
in the living room, a car horn sounded outside. Since we were
standing up, I turned around to look out the large window, and
I told him "somebody is calling". He stood up and went out.
He asked us to wait for him "for a minute", that he would
tend to the gentleman . It was at around twenty after six in
the evening, about one hour. I kept looking out the window.
The gentleman that had arrived, "pulled in" with the car,got
out and they greeted by shaking hands.He was wearing blue
denim or tweed pants. I do not remember the shirt. Since we
found it so normal that  they greeted , it did not look to us
that anything was amiss. They stayed outside and walked,and then
they apprached the (security) guard's booth. I lost them (in
the distance) and then I realized that they were upstairs in
the house: I do not know which way they entered, and,eventually,
they arrived together at where we were, by coming in through
the front door.Laureano asked us to wait outside,that he would

soon finish tending to us, and they stayed there, inside.
Mariano and I went over to see the car that the gentleman
arrived in, which was a white BMW.Although they had been in
the living room, they moved on towards the back of the house
and we managed to see them through the large window. While
we were looking at the car, a detonation was heard, reason
for which Mariano and I started towards the house to see
what had happened.We went inside the house and when we went
in, we saw the gentleman that had arrived sprawled on the
floor,in one of the bedrooms,and Mr. Laureano close to the
back wall clutching his stomach with his hands,on his left
side,and told us: " He hit me, this one hit me". As we
went in, Mariano approached the body of the gentleman on the
floor and looked for a pulse in his neck. Mariano told me
that he was alive; there was no blood and I did not see
Laureano injured, nor bleeding. I asked him what was
happening and Laureano asked us to please help him "collect
him" and "put him in the car and take him to San Ramon"
I said "No!", that he was crazy, that we would not get
involved in problems,that I would call the police, reason
for which I went to the livigg room and grabbed the phone.
Mariano, my associate, followed me and Laureano also went to
the living room, trying to block me from calling, grabbing
the phone away from me, but my fingerprints were left on it.
He asked me to relax, and let everything be, that his wife,
or "woman" (I don't remember which he said...)would soon
arrive. I immediately told him we were leaving.

As we were walking out to the street, a white car,with

polarized glass arrived, driven by a woman who seemed mannish, and she parked the car in front of the entrance to the large gate,which was wide open. We passed it by the front end, on the passenger side, then went out to the main road, and we started looking for Alfredo,our associate, because we had lost him in the journey. We managed to spot Alfredo at about one hundred and fifty meters off the main street entrance, While Mariano and I were walking down the right sidewalk, Alfredo managed to see us,turned the headlights on and we got in the car. While asking us how had it gone, did we get the assignment, or rather, would we be following her. I told him that once we would get to Francis, we would have an answer because there had been a problem. We left and Alfredo was driving towards Sabanilla, being that- in addition to investigations- he also was involved in sales of cellular phones, and he was supposed to visit a client from Sabanilla. For that reason, Mariano told him that maybe we should not go to his client, but to look for Francis instead. That caused an argument between them and Mariano to get out of the car, because we needed to go over Francis for him to explain to us what had happened. Alfredo got out at the Sabanilla Park and we went home to pick up my son. We decided to stop to call Francis on the phone; we called him from a public pay phone, but he did not answer and we decided to continue on to pick up my son, which we did. At about eight p.m.,Alfredo called Mariano's Beeper and asked us to call him at a phone number he had given us, in which we had recorded or filmed an individual known as "vaca flaca" (thin cow) related to

an assignment we had had, associated with an unfaithful
wife. I called him at that phone number and told him to
take a taxi to my house, and that I would pay for it. He
arrived at about eight twenty. We all left my house (Mariano,
my son, Alfredo and I) towards Alajuelita, to drop my son
off at a female friend of mine's house, near Marielo. We
left him there at about eight thirty, and I stayed behind.
talking to Marielos, and I left towards the gas station.
We arrived at about nine p.m., got gas and, from there, we
went to Anonos, to Francis's house, but we didnot find him,
because he was not there. We then left towards a bar in
Romhoser, down the triangle where Francis goes often, and we
did find him there. I asked him what had he sent us to that
house for, and I told him what had happened, which surprised
him, worried him and he told us that he would call the man,
meaning Laureano, to find out what had happened and that he
would then talk to us. It was then almost nine thirty, with
the agreement that he would later tell us what had happened.
We left the premises in order to locate a vehicle for which
there was a seizure order, in the vicinity of the American
Embassy. The client that had retained us to find this car was
Javier Laitano, which we did do next day, meaning November
nineteenth. THAT IS ALL. The record was read, was approved,
upon hearing it aloud, and signed in order to certify it.
ADRIANA JARQUIN COTO, Esq.     JUDGE.

(Signed)     (Signed) M. E. Voltmer



*DECLARACION TESTIMONIAL DE: MARTIN FEDERICO CARVAJAL VILLALOBOS.*

*JUZGADO SEGUNDO INSTRUCCION DE CARTAGO*, al ser las nueve horas cuarenta minutos del cuato de diciembre de mil novecientos noventa y siete.

Presente en este Despacho el testigo quien es debidamente juramentado por la suscrita jueza, y apercibido acerca de las penas con que la ley castiga el delito de *Falso Testimonio* y la denuncia calumniosa en materia penal, entendido jura decir la verdad. *IDENTIFICACION DEL TESTIGO:*

*NOMBRE: MARTIN FEDERICO CARVAJAL VILLALOBOS.*

*CONOCIDO (A) COMO: NO TIENE OTRO NOMBRE CONOCIDO NI APODO.*

*TELEFONO DE LA CASA O ALGUN FAMILIAR: NO TIENE. PERO SE LE PUEDE LOCALIZAR AL BEEPER 296-26-26. CODIGO 900-348.*

*DE 34 AÑOS DE EDAD.*

*NACIONALIDAD:* Costarricense.

*ESTADO CIVIL:* casado.

*DE PROFESION U OFICIO: INVESTIGADOR PRIVADO.*

*LUGAR Y DIRECCION DEL TRABAJO: NO TIENE LUGAR FIJO DE TRABAJO U OFICINA, REFIERE REALIZA TRABAJOS A NIVEL NACIONAL.*

*HIJO DE FEDERICO CARVAJAL ALVAREZ, Y DE MARIA RITA VILLALOBOS JIMENEZ. EL PRIMERO FALLECIDO Y LA SEGUNDA BARRIO SN MARTIN SAN SEBASTIAN. SAN JOSE.*

*DOMICILIO ACTUAL:* Hatillo dos, del Brenes Mesén, setenta y cinco metros al este, alameda siete, casa número 796, de color blanco con verjas negras, de cemento.

Seguidamente es interrogado (a) acerca de los hechos que se investigan,

entendido *DECLARA:* No conozco a las partes de este asunto, el día martes dieciocho de noviembre del año en curso, el licenciado FRANCIS TEJADA BARRANTES, nos llamó a MARIANO y a mí por beeper para indicarnos que nos tenía un trabajo, a este señor Tejada lo conocemos porque fue jefe mío cuando laboré en la U.P.D., él llamó primero a Mariano a su beeper y y Mariano me informó a mí, que él tenía un trabajo para nosotros, fuimos a almorzarm y posteriormente nos presentamos al parque central de San José, a las cuatro y treinta de la tarde y nos encontramos con Francis, quien nos manisfestó a Mariano a Alfredo y a mí, acerca de un seguimiento para la esposa de un cliente de él, no mencionó el nombre del cliente, pero nos dijo que lo esperáramos, mismo que se presentó a las cinco de la tarde, hasta es momento en que él se bajó el vehículo un carro deportivo de color rojo oscuro, de dos puertas, polarizado. no sé la marca, se acercó a nosotros don Francis nos lo presentó, antes de que él llegara don Francis nos comentó que quería que siguiéramos a la esposa porque aparentemente le estaban poniendo los cuernos, pero nos dijo que mejor esperáramos a que él nos dijera, cuando el señor se nos acercó y fue presentado, nos dijo que abordáramos el vehículo mismo que ya describí, pero yo le dije que nosotros andábamos en un carro, que mejor lo seguíamos a él, pero nos dijo que entonces como éramos tres, que nos fuéramos dos con él y el otro nos siguiera, así lo hicimos y Mariano y yo nos subimos a su carro, Mariano en el asiento trasero y yo en el asiento delantero de acompañante, yo le pregunté que para dónde íbamos, para que el compañero Alfredo nos siguiera, él dijo que Al Roble en Lourdes,

atravesamos San José por la avenida segunda, había mucha presa, en esa la rotonda de la Hispanidad, cuando pasamos el compañero se quedó se perdió en la aglomeración de tránsito, llegamos a las cinco y cuarenta, a la casa del cliente de don Francis, o sea Laureno, ese es un tiempo aproximado, Mariano solicitó el servicio y me fui con el señor Montero a un cuarto donde hay una computadora que él prendió y empezó a manipularla, en eso iba a sacar algo de un maletín que él llevaba en su carro y que al bajarnos sacó, yo presumí que era un diskete, pero en realidad lo que sacó fue un aparato negro, rectangular, con dos puntas de metal en un extremo, mismo que sé es un chuzo eléctrico, y me dijo que le alcanzara otro chuzo que estaba sobre el planchador mismo que se ubica en un patio de pilas, yo se lo alcancé, el mismo estaba con las baterías afuera, antes de salir Mariano del servicio él me dijo que le habláramos del tipo de trabajo que realizábamos, le comenté que era de localizaciones, captura de vehículos, seguimientos de personas por infidelidad, en eso salió Mariano del baño yo se lo pedí, una vez que salí del baño el señor Montero seguía en la computadora, dejó la misma, se fue para el servicio acción que hizo en varias ocasiones, una de las cuales cuando salió noté que se había cambiado de ropa, pues le ví un suéter puesto, pero no nos decía en sí para qué nos habían buscado, en una de las tantas veces que fue al servicio mientras quedamos solos Mariano y yo, pude escuchar un ruido como de pasos en la parte superior, es decir en el segundo piso, nosotros estábamos debajo, en el primer piso, cuando él salió del baño yo le pregunté que si había alguién más en la casa, nos dijo

que no tranquilos, yo le comenté a Mariano que qué raro que no quisiera entrar en el tema, y nos fuimos a la sala, cuando estábamos en la sala nos preguntó: ``... ustedes creen que una mujer a la que se tenga viviendo en una casa a... le pueda dar vuelta a uno...´´, yo respondí que sí, pues no es la primera vez que me corresponde hacer un trabajo de ese tipo, e incluso le comenté de un caso que investigué, me dio la impresión de que él estaba haciendo tiempo como que estaba esperando algo o a alquien. Mientras estamos en la sala sonó un pito de carro afuera, como nos encontrábamos de pie yo volví a ver hacia la ventana que es grande, y le dije a él que llamaban, se paró y salió nos dijo que lo esperaramos un momentito que atendería a ese señor, esto fue como a las seis y veinte de la tarde, una hora aproximada, entonces seguí viendo por la ventana, el señor que llegó ingresó con el carro se bajó del mismo y se saludaron dándose la mano, iba vestido de pantalón de mesclilla azul, no recuerdo la camisa, como nosotros vimos eso tan normal de que se saludaron, , no nos pareció nada anómalo, se quedaron afuera, caminaron, luego se fueron para la caseta del guarda, los perdí de vista y luego me dí cuenta estaban en la parte alta de la casa, no sé por donde ingresaron, despuès llegaron juntos a donde nosotros estábamos, llegando por la puerta principal, nos dijo Laureano que lo esperáramos afuera que ahorita terminaba de atendernos, y ellos quedaron ahí adentro, Mariano y yo nos fuimos a ver el carro que traía el señor que llegó el cual era un BMW de color blanco, cuando están en la sala se van hacia adentro de la casa los logramos ver a traves de la ventana grande, mientras estamos viendo el

carro, se escuchó una detonación, por lo que Mariano y yo salimos hacia la casa para ver qué había pasado, entramos en la casa, y en lo que entramos vimos al señor que había llegado, tirado en el suelo en uno de los cuartos, y el señor Laureano cerca de la pared del fondo sosteniéndose el estómago con las manos en el lado izquierdo, y nos dijo ``me pegó, éste me pegó´´, en lo que entramos Mariano se dirige al cuerpo del señor en el suelo y le busca el pulso en el cuello, Mariano me dijo que estaba vivo, no había sangre, yo no vi a Laureano herido, ni sangrando, yo le dije que qué era lo que estaba pasando, y Laureano nos dijo que por favor le ayúdaramos a juntarlo y que lo metiéramos al carro para llevarlo a San Ramón, por lo que yo le dije que no, que él estaba loco, que nosotros no nos metíamos en problemas, que yo llamaría a la policía, por lo que me fui para la sala tomé el teléfono, mi compañero Mariano se vino detrás de mí, y Laureano se vino para sala, impidiéndome llamar, arrebatándome el teléfono, pero mis huellas quedaron en el mismo, él me dijo que dejara todo tranquilo que ahorita llegaría su mujer, o su esposa no recuerdo como fue que lo dijo, yo inmediatamente le dije que nosotros nos íbamos, en lo que íbamos saliendo ya a la calle, llegó un carro blanco, polarizado, automóvil, con quemacocos, conducido por una mujer, misma que era macha, la cual parqueó el carro en el frente de la entrada del portón grande, el cual estaba totalmente abierto, nosotros le pasamos de frente, por el lado del acompañante, entonces salimos a la calle principal, y empezamos a buscar a nuestro compañero Alfredo, pues él se había perdido en el recorrido, logramos divisar a Alfredo como a unos ciento

cincuenta metros de la entrada calle principal, Mariano y yo caminábamos por la acera derecha, Alfredo logra vernos nos enciende las luces y nos subimos al carro, preguntándonos qué cómo nos había ido, que si había salido el trabajo, o bien que si lo íbamos a hacer el seguimiento, yo le dije que ahora cuando llegáramos donde Francis le comentábamos porque había habido un problema. Nos fuimos y Alfredo conducía con rumbo a Sabanilla, ya que él se dedica además de investigador a la    venta de teléfonos celulares y tenía que visitar a un cliente de Sabanilla, por lo que Mariano le dijo que mejor no fuéramos donde su cliente, sino que buscáramos a Francis, esto origina una pequeña discución entre los dos, y  Mariano le dice que se baje del carro porque nosotros necesitamos ir donde Francis, para que nos aclarara que había pasado, Alfredo se baja en el parque de Sabanilla y nosotros nos vamos para mi casa a recoger a mi hijo, decidimos detenernos para llamar a Francis por teléfono, lo llamamos de un público, pero no nos atendió y decidimos seguir a buscar a mi hijo, lo cual hicimos, como a las ocho de la noche, Alfredo llamó al beeper de Mariano, y le dijo que lo llamáramos a un teléfono qu nos dió, donde habíamos grabado o filmado a un sujeto conocido como ``vaca Flaca'', esto es de un trabajo que nosotros hicimos de una esposa infiel, yo lo llamé al teléfono y le indiqué que se viniera en taxi para mi casa, que yo se lo pagaba, él llegó como a las ocho y veinte, nos fuimos de mi casa Mariano, mi hijo, Alfredo y yo con rumbo para Alajuelita, a dejar a mi hijo donde una amiga mía de donde Marielos, lo dejamos ahí como a las ocho treinta, me quedé  hablando con Marielos, y salimos de ahí para

la bomba. Llegando a ésta como a las nueve de la noche, le echamos gasolina al carro, de ahí nos fuimos para los Anonos a la casa de Francis, y no lo encontramos porque no estaba, nos fuimos entonces para un bar a Romhoser por el triangulo donde frecuenta ir Francis, lugar donde logramos encontrarlo, hablamos con él, y le dije que a qué nos había mandado él a esa casa, y le narré los hechos, a lo cual él se asombró, se asustó, y nos dijo que él llamaría al hombre, refiriéndose a Laureano, para ver que había pasado, y que luego él nos hablaría a nosostros, eran ya casi las nueve y media, con ese convenido de que él luego nos informaría que pasó, nos fuimos del lugar, para ubicar un vehículo que tenía orden de captura, esto por los alrededores de la Embajada Americana, el cliente que nos dió la captura de este vehículo se llama Javier Laitano, la cual la ejecutamos al día siguiente o sea diecinueve de noviembre. Es todo. Leída que le fue el acta la encuentra conforme al escucharla en voz alta y para hacer constar firma. LICDA. ADRIANA JAROUIN COTO.-.JUEZA.

# EXHIBIT B

WITNESS STATEMENT OF:   MARIANO JESUS SANDOVAL RODRIGUEZ

SECOND MAGISTRATE COURT OF CARTAGO, at nine hours and thirty

minutes on December the fourth nineteen ninety seven.-

Appearing, in chambers, there is a witness who has been

informed of the penalties with which the law punishes perjury

and, duly sworn by the undersigned hearing judge, he represents:

I swear to tell the truth.

IDENTIFICATION OF THE WITNESS:

NAME:   MARIANO JESUS SANDOVAL RODRIGUEZ

ALSO KNOWN AS:   Mariano Zamora

BEARER OF NATIONAL IDENTIFICATION DOCUMENT NUMBER:   1-658-730

WHICH HE PRODUCES AND IS VALID AND IS IMMEDIATELY RETURNED TO HIM.

HOME PHONE (OR A RELATIVE'S):   286-23-36 (the mother's)

AGE:   32 years old

NATIONALITY:   Costarrican

MARITAL STATUS:   Married      TO:    Martha Vindas Barberena

OCCUPATION:    Investigator

LOCATION AND ADDRESS OF EMPLOYER:   CIA DE COSTA RICA

EMPLOYER'S TELEPHONE (NUMBER):   Beeper 224-2400

SON OF   Mariano Sandoval Loria  AND   Xinia Rodriguez Alvarez

(Deceased)           and       Retired      respectively

CURRENT ADDRESS:   Sagrada Familia, 125 North of the Catholic
Church, wooden house on the left.

He is interrogated about the events being investigated. And he

STATES:   I had met the defendant hours before the incident:

I had no relationship with him and I did not know the victim.

Mr. Alfredo Alvarado, Martin Carvajal and myself work doing

private investigations. In the afternoon hours of November eighteenth of this year, I received a Beeper message from Francis Tejada, Esq. who had been Director of UPD. In the message I was told that he had a task for us and that we could earn one hundred and fifty thousand colones.This was about three in the afternoon. In the message, (he) gave me a public phone number for me to call him,which I did. I called him from a public phone in Desamparados. He told me that he had a client who needed our services. We agreed to meet in Central Park close to four in the afternoon (of) that same day. After that call, my associates and myself went out to lunch down Plaza Gonzalez Vasquez and, from there, we traveled to Central Park, arriving at about twenty after four. We talked to Francis and he told us that a client needed to have his wife followed, and that he had recommended us. Francis told the client that the fee,for a week, would be one hundred and fifty thousand colones,to which I responded that we could negotiate with the gentleman. It is to be noted that,when we arrived at central Park, Mr Laureano Montero,who was the client, was not there. Francis was the only one there. I asked him where was Mr. Laureano. He answered me that he had been there just a moment ago, that he had probably gone on some errand. At about five in the afternoon, a red two door vehicle parked near the Central Park public phones. We said hello to the gentleman,and ultimately Martin Carvajal and I entered the vehicle. We asked Alfredo to follow us, because our vehicle was at a parking lot/garage near the park. We were on our way towards the gentleman's house, located at

Urbanizacion El Roble, at Lourdes Montes de Oca, on the
La Hispanidad Circle. We lost track of Alfredo, who had been
following us. We arrived at Mr. Laureano's house and we went
in. I asked to use the bathroom. Later on, the gentleman showed
us around every section of the house, which we found strange,
because it is not usual that clients do that. He was not
telling us what the assignment would be about. A few minutes
later, he made a phone call and came back to us. He later went
inside the guest bathroom. It was then that Carvajal asked me
to pay attention because he thought he had heard people on the
second floor of the house. When Laureano came out of the bath-
room, Carvajal asked him whether there were people in the
apartment upstairs, and he said no. A few minutes later, we
heard a car horn coming from outside the house; we told him
that they kept blowing the horn and that they were outside the
house. He asked us to give him a few minutes, he opened the
gate and a white vehicle pulled in. Somebody wearing glasses
got out, said hello to Laureano. They started conversing
cordially. He then started showing him the outside of the house
They went inside a booth/shed and were watching it. They
went around the park and neighboring areas. Then they went
to the upstairs apartment, came down and when they were about
to enter Laureano's apartment,he asked us to wait outside while
he was with the gentleman. They were talking in the living
room and soon after louder voices were heard, While we were
close to the vehicle , we watched through the window when they
both went in where the other two rooms were, and about five or

ten minutes later, we heard a sound like that of a gunshot.
We immediately went inside the house and we were able to see the
gentleman visiting Laureano laying on the floor, face down
and Laureano standing clutching his stomach. We asked him
what had happened and he answered "he hit me, he hit me
this freaking (guy)!". I then knelt and I started checking
the gentleman's neck, to determine whether he was alive,and
I did not detect blood on his body. Martin asked him what
had happened and said that he was calling the police.Martin
and I went towards the living room and Mr. Laureano followed
behind us. Martin took the phone to call the police,but he
told him not to, that he would take care of the matter, and
that his wife was about to arrive anyway. We immediately
left the premises, leaving Laureano in the living room.As we
were leaving, a white vehicle was in the process of parking
at the entrance of the parking area of Laureano's house,and
which we passed, facing it, and I was able to observe a fair
haired woman, who was driving it. We got to the main highway
or thoroughfare, and we watched for Alfredo who never got to
Laureano's house. We had been in that house for about forty
five minutes. By then, it was approximately six forty five
in the evening. Since we did not see Alfredo, we went walking
down , and we noticed that they were signaling to us, by
blinking the headlights. We approached the  vehicle and saw
Alfredo behind the wheel, asking us what had happened;we told
him that, whenever we would get to Francis, we would let him
know.Later on, once inside the vehicle, we headed to the

highway leading to Santa Marta; I asked Alfredo where
were we going and he said: "To sell a cell phone to a friend".
We started arguing,because I was nervous and told him that I
would not be going anywhere, that he (should) get off and
that he should go alone to sell the cell phone. He did,in
effect, get off, so I drove the vehicle and we headed towards
Martin's house, during which Alfredo sent me several Beeper
messages and gave me a phone number to call him, which Martin
did from a public-pay-phone located outside the"Sagrada
Familia" Catholic Church. Martin told him to take a taxi-cab
and go to Hatillo. A few minutes later, Alfredo arrived and
I gave him money to pay for the taxi (ride). We waited for
Martin's son to get ready and we left to go to Alajuelita
over a family friend of Martin's, because the son was going
to stay there ,to sleep overnight. From there we went to
the Alajuelita gas station,and then on to attorney Francis
Tejada's(Esq.) house, who, incidentally, was not home.
For this reason, we went to a bar in Pavas, where we did
locate him. Martin got out of the vehicle (and) called him
so he would talk to us, (and) we asked him what had he sent
us to do,with Laureano, because an incident had happened in
his house. We narrated to him everythjng that had happened;
he told us to relax (because) he was going to find out what
had happened. After that, we left and we went around the
American Embassy several times,because we were  in the process
of locating a vehicle against which there was a seizure warrant.
From there, we went to drop off Alfredo at his house. Martin
wanted to have something to eat, so we went to San Jose. We
did not find a place we liked,so I told him we should go to

Manuel's Bar in San Juan de Dios de Desamparados; we went
there, Martin had something to eat, and then, I went to drop
him off at his house, and then on to my house. By then, it
was approximately eleven thirty at night. I want to note that,

when I checked the man's body, whom we were later told was
Jose Borrase, he appeared to be sort of disheveled, had no
visible injuries and -like I said- one could not see any
blood anywhere. The woman who was parking at the entrance to
Laureano's house, was not somebody I got to see well because
the car windows were "polarized". I did get to see that she
was young, fair haired, thst it was a white vehicle, a sedan,
and I remember I did get to notice that it's license plate
started with a number "two", but I was not able to distinguish
any other characteristics of the vehicle.- Later on,we found
out everything that had happened from the newspapers.THAT IS
ALL. Having read the above statement aloud, he confirms and
signs it,accordingly.-

                    (Signed)
          ADRIANA JARQUIN COTO,ESQ.
                    JUDGE


WITNESS X (Signed)_____


   melv.-

*DECLARACION TESTIMONIAL DE:* <u>MARIANO JESUS SANDOVAL RODRIGUEZ</u>
*JUZGADO SEGUNDO DE INSTRUCCION DE CARTAGO, al ser las nueve*
*horas treinta minutos del cuatro de diciembre de mil novecientos noventa y siete.-*
*Presente en este Despacho un (a) testigo, quien es impuesto (a) de las penas con que*
*la ley castiga el delito de falso testimonio en materia penal y juramentado (a) en*
*forma legal por la suscrita juez de instrucción, entendido manifiesta: Juro decir*
*verdad.*

### *IDENTIFICACION DEL TESTIGO:*

*NOMBRE: MARIANO JESUS SANDOVAL RODRIGUEZ*
*CONOCIDO (A) COMO: Mariano Zamora*
*PORTADOR (A) DE LA CEDULA DE IDENTIDAD NUMERO: 1-658-730*
*QUE SI MUESTRA VIGENTE Y SE LE DEVUELVE EN EL ACTO.*
*TELEFONO DE LA CASA O ALGUN FAMILIAR: 286-23-36 ( de la madre)*
*DE 32 AÑOS DE EDAD.*
*NACIONALIDAD: Costarricense*
*ESTADO CIVIL: Casado CON: Martha Vindas Barberena*
*DE PROFESION U OFICIO: Investigador*
*LUGAR Y DIRECCION DEL TRABAJO: CIA DE COSTA RICA.-*
*TELEFONO DEL LUGAR DE TRABAJO: beeper 224-2400.-*
*HIJO DE Mariano Sandoval Loría Y Xinia Rodríguez Alvarez.-*
*de oficio fallecido y pensionado respectivamente.*
*DOMICILIO ACTUAL: Sagrada Familia, 125 norte de la Iglesia Católica, casa de*
*madera a mano izquierda.-*
*Seguidamente es interrogado (a) acerca de los hechos que se investigan, entendido*
*DECLARA: Conocí al acusado horas antes de los hechos, no tenía ninguna relación*
*con él, al ofendido no lo conocía.- El señor Alfredo Alvarado, Martín Carvajal y mi*
*persona, trabajamos en investigaciones privadas, en horas de la tarde del dieciocho*

de noviembre del año en curso, recibí por beeper un mensaje del Lic. Francis Tejada, quien fue director de la UPD, el mensaje me indicaba que tenía un trabajo para nosotros y que nos podíamos ganar ciento cincuenta mil colones, esto fue como a eso de las tres de la tarde aproximadamente; en el mensaje me dio un número de teléfono público para que lo llamara lo cual hice, lo llamé desde un teléfono público en Desamparados, me indicó que tenía un cliente que necesitaba nuestros servicios, quedamos en reunirnos en el parque Central cerca de las cuatro de la tarde de ese mismo día, luego de esa llamada los compañeros y mi persona nos fuimos a almorzar allá por Plaza González Víquez, de ahí nos trasladamos al parque Central, donde llegamos como a las cuatro y veinte aproximadamente, hablamos con Francis y nos dijo que un cliente necesitaba que le siguieran a la esposa y que él nos había recomendado, Francis le indicó al cliente que se cobraban ciento cincuenta mil colones por una semana a lo cual le dije que nosotros íbamos a negociar con dicho señor, cabe señalar que cuando nosotros llegamos al Parque Central no se encontraba el señor Laureano Montero, quien era el cliente, solamente estaba Francis, yo le pregunté donde se encontraba el señor Laureano, me respondió que hacía un momento estaba en ese lugar, que seguramente andaba en alguna diligencia.- Como a eso de las cinco de la tarde se estacionó cerca de los teléfonos públicos del parque Central un vehículo de dos puertas, color rojo, saludamos al señor, posteriormente ingresamos al vehículo Martín Carvajal y yo, le indicamos al compañero Alfredo que nos siguiera ya que el vehículo nuestro se encontraba en un estacionamiento cerca del parque.- Nos dirijímos hacia la casa del señor, la cual se ubicaba en la Urbanización el Roble en Lourdes de Montes de Oca, en la rotonda de la Hispanidad perdimos de vista al compañero Alfredo, quien venía siguiendonos, llegamos a la casa del señor Laureano e ingresamos, le solicité el baño, posteriormente el señor nos mostró cada parte de la casa, cosa que nos pareció extraño pues no es normal que un cliente haga eso, no nos indicaba de que se trataba

el trabajo a realizar, minutos después hizo una llamada y volvió con nosotros, posteriormente ingresó al baño de visitas, cuando el compañero Carvajal me indicó que pusiera atención ya que le pareció haber escuchado gente en la segunda planta de la casa, al salir Laureano del baño, Carvajal le preguntó si había gente en el apartamente de arriba y éste le dijo que nó, minutos después escuchamos el pito de un vehículo en las afueras de la casa, se le indicó que estaban pitando y que era al frente de la casa, nos dijo que le dieramos unos minutos, abrió el portón e ingresó un vehículo blanco del cual se bajó una persona de lentes, saludó a Laureano y se pusieron a conversar amablemente, seguidamente empezó a mostrarle la casa por fuera, ingresaron a una casetilla, la estuvieron observando, se anduvieron por el parque y alrededores, después estuvieron en el apartamento de arriba, bajaron, cuando iban a igresar al apartamento de Laureano éste nos dijo que esperaramos afuera mientras atendía al señor, estuvieron conversando en la sala, momentos después se escucharon voces más fuertes, estando nosotros cerca del vehículo que posteriormente llegó observamos por el ventanal cuando los dos ingresaban donde se encuentran las otras dos habitaciones; como a los cinco o diez minutos después escuchamos un ruido como de un disparo, inmediatamente ingresamos a la casa y pudimos ver al señor que visitaba a Laureano tirado en el suelo boca abajo, y a Laureano de pie y con las manos en el estómago, le preguntamos que qué había pasado, y nos respondió " me pegó, me pegó, este desgraciado", acto seguido me agaché y empecé a revisar al señor en el cuello, para ver si estaba con vida, y no noté sangre en su cuerpo, Martín le dijo que qué era lo que había pasado y que iba a llamar a la policía, nos fuimos hacia la sala Martín y yo y detrás venía el señor Laureano, Martín tomó el teléfono para llamar a la policía y éste le dijo que no, que él se encargaba del asunto, que de todos modos ya iba a llegar su esposa, inmediatamente nos marchamos del lugar dejando a Laureano en la Sala, al ir nosotros saliendo se estaba estacionado un vehículo blanco en la entrada del parquec

7

de la casa de Laureano, al cual le pasamos de frente y pude observar a una mujer de pelo claro que lo venía conduciendo, llegamos a la carretera principal y observabamos para ver si podiamos ver al compañero Alfredo que nunca llegó a la casa de Laureano, estuvimos aproximadamente cuarenta y cinco minutos en esa casa, ya eran aproximadamente las seis y cuarenta y cinco de la tarde.- Como no vimos a Alfredo nos fuimos caminando hacia abajo, cuando pudimos observar que nos hacían cambio de luces y nos dirijimos hacia el vehículo, el cual conducía el compañero Alfredo, preguntándonos éste qué había pasado, y le indicamos que cuando llegaramos a hablar con Francis le decíamos.- Luego ya en el vehículos nos dirijimos carretera a Santa Marta, le pregunté a Alfredo que para donde ibamos y me dijo que a venderle un teléfono celular a un amigo, empezamos a discutir ya que yo me encontraba nervioso y le dije que yo no iba a ningún lado, que se bajara y que él fuera solo a vender el celular, efectivamente se bajó y yo conduje el vehículo, y nos dirijiamos a la casa de Martín cuando Alfredo me pasó varios mensajes al beeper y me dio un número de teléfono para llamarlo lo cual hizo Martín en el teléfono público que se encuentra en las afueras de la Iglesia Católica de Sagrada Familia, Martín le indicó que tomara un taxi y que llegara a Hatillo, a la casa de Martín, después de esa llamada nos dirijimos a Hatillo, a los minutos llegó Alfredo yo le di dinero para que pagara el taxi, esperamos que el hijo de Martín se alistara y nos fuimos a Alajuelita donde una amiga de Martín, para que el hijo se quedara durmiendo en ese lugar, de ahí nos fuimos a la estación de gasolina de Alajuelita y de ahí a la casa del Lic. Francis Tejada, el cual no se encontraba, por lo que nos dirijimos a un bar en Pavas donde lo pudimos encontrar, Martín se bajó del vehículo, lo llamó para que hablara con nosotros y le preguntamos que a qué nos había mandado con Laureano porque había pasado un problema en su casa, y le narramos todo lo sucedido y él nos dijo que nos tranquilisaramos que él iba a averiguar lo que había pasado, después de esto nos fuimos y dimos varias vueltas por la embajada Americana, ya que

andabamos localizando un vehículo que tenía orden de captura, de ahí nos fuimos a dejar a Alfredo a su casa, como Martín quería comer algo fuimos a San José, como no encontramos un lugar que nos gustara le dije que fuesemos al bar de Manuel en San Juan de Dios de Desamparados, fuimos, Martín se comió algo, de ahí fui a dejarlo a su casa y de ahí me fui a la mía, esto fue aproximadamente a las once y media de la noche.- Quiero indicar que cuando revisé el cuerpo del hombre, que posteriormente supimos que era José Borrasé, el mismo se notaba como desmallado, no tenía ninguna lesión visible, y como dije no se notaba sangre por ningún lado.- La mujer que se estaba estacionado en la entrada de la casa de Laureano, no pude ver bien como era ya que los vidrios del vehículo son polarizados, si pude ver que se trataba de una persona joven de cabello claro, el vehículo era blanco, tipo automovil, recuerdo que pude observar que la placa de este vehículo empezaba con el número dos, no puedo precisar más caracteristicas del vehículo.- Posteriormente nos dimos cuenta de todo lo sucedido por medio de la prensa.- ES TODO. Leída que le fue la anterior declaración en voz alta, la ratifica y firma conforme.-

LICDA. ADRIANA JARQUÍN COTO

JUEZA

TESTIGO

melv.-

# EXHIBIT C

DECLARANT:  JUAN CARLOS STELLER VARGAS                WITNESS

AT THE PRELIMINARY COURT, SPECIAL ROTATION, OF SAN JOSE.
At twenty hours and thirty minutes,on December fourth
nineteen ninety seven. Present in chambers is a person who
witnessed the present incident. He is informed of the
penalties the law imposes for false testimony/perjury in
criminal cases, he is sworn and gives his name as JUAN
CARLOS STELLER VARGAS,of age, single, construction laborer,
Nstl ID Document 2-449-891, resident of Tirrases de Curridabat,
Unit 122, IMAS. He is not related to the person charged in
this case. Upon being questioned about the incidents being
investigated, he STATES:  Approximately two or more weeks
ago, I am not sure about the date, in the evening,after
nine p.m., I was at my plce of work, outside Residencial
Tolima, at a warehouse, and I was asleep when, at some point,
I heard a woman shouting and cursing, reason for which I
went out to see what was happening. I saw nothing in the
street, so I returned again to the warehouse located towards
the rear of the property. I was able to hear that they were
arguing,so I climbed atop a mound,behind the warehouse, and
I was able to see the people fighting: three men and a
woman. A big, heavy set one beating the other two, and the
woman was leaning against a car, but I do not remember what
kind. They were fighting smack in the middle of the street.
The bigger one hit one of the guys, who went down and he was
going to hit him more, but he (?) put his hands up,and said:

" You're not good for anything", raised his hands and called the other one. I was able to see that he had a handcuff in his hand,so I thought he was an officer. At some point, a light went on in a house,so I backed away, so they would not see me,and they continued to fight. The woman only watched. Then, again, the  (ILLEGIBLE) one that had the handcuff in his hand hit one of them who lost his balance and fell, which caused  (ILLEGIBLE) one to lunge with an object that I thought was a club (stick?) and (ILLEGIBLE) to the big one. I did not see where he hit him because,at that moment, I crouched,so they would not (be able to) see me.Then the big one,who had received that blow, sort of restrained the small one, who had the object in his hand,in order to also restrain, and try to stop the big one. They all fell against the gate accross from which it happened, which was ajar. He continued defending himself, throwing punches,and I stepped down from the mound, so they would not see me, and also because it was sort of drizzling. The smaller one was thin, about one meter sixty (cm), or slightly taller. His hair was matted, black, tweed or denim pants and I do not remember the shirt. The next one (in size?) was a little bigger, dark, around one meter seventy five (cm), strong build, but not fat.dark pants, dark shirt, with short, straight hair. The big one was heavy, like fat,about one meter eighty (cm), with dark clothing; this is the one that had a handcuff in his hand. The woman was like mannish, somewhat slender, or normal weight, rather. I do not remember what

she was wearing. THAT IS ALL. The record was read, was approved, upon hearing it aloud and signed. (Signature) Marvin Vega Rivera, Esq. Judge.                    (Signed)


    __(Signed)_____




*Marcia E. Voltmer*

DECLARA: JUAN CARLOS STELLER VARGAS          TESTIGO

EN EL JUZGADO DE INSTRUCCION DE TURNO EXTRAORDINARIO DE SAN JOSE, al ser las veinte horas con treinta minutos del cuatro de diciembre de mil novecientos noventa y siete. Presente en este Despacho una persona que es testigo en el presente asunto, es impuesto de las penas con que la ley castiga el falso testimonio en materia penal y entendido y juramentado dice llamarse JUAN CARLOS STELLER VARGAS, mayor, soltero, peón de construcción, cédula 2-449-891, vecino de Tirrases de Curridabat, casa 122, IMAS. No tiene ningún parentesco con la persona acusada en el presente asunto. Interrogado sobre los hechos que se investigan DECLARA: hace aproximadamente dos o más semanas, no preciso la fecha, en horas de la noche después de las nueve p.m., me encontraba en mi lugar de trabajo frente al residencial Tolima, en una bodega, estaba durmiendo y en determinado momento escuché a una mujer como gritando u ofendiendo, por lo que salí a observar que ocurría, pero en la calle no observé nada y regresé de nuevo a la bodega que está en el fondo del lote, pude escuchar que discutían, por lo que me subí a un montículo de tierra que está detrás de la bodega y pude observar a unas personas peleando; tres hombres y una mujer. Uno grande grueso que le pegaba a los otros dos y la mujer estaba arrecostada a un carro no recuerdo el tipo. Ellos estaban peleando en plena calle. El más grande le dio un golpe a uno de los muchachos quien cayó y luego le iba a pegar más, pero levantó sus manos y dijo ''usted no sirve para nada'', levantó las manos y llamó al otro. Pude observar que tenía una esposa en su mano izquierda y creí que se trataba de la autoridad. En determinado momento se encendió una luz en una casa y yo me hice más para atrás para que no me vieran y siguieron peleando. La mujer únicamente observaba. Luego nuevamente el ... r que tenía la esposa en su mano, le pego un golpe a uno ... los, quien perdió el equilibro y cayó, por lo que el más ... se dirigió con un objeto que creí que era un palo y ... al grande. No observé por donde lo golpeó, porque en

ese momento me agaché para que no me vieran, luego el grande, que recibió el golpe, como que abrazó al pequeño que tenía el objeto en su mano y ese momento fue que aprovechó el otro que estaba en el suelo, para irse también a abrazar y tratar de detener al grande. Todos juntos se fueron contra el portón de la casa que estaba frente a donde ocurrieron lo hechos, el cual estaba entreabierto y él se seguía defendiendo, tirando golpes y luego yo me bajé para que no me vieran y también porque estaba como lloviznando. El más pequeño era delgado, como de un metro sesenta o un poquito más, temía el pelo acolochado, color negro, pantalón de mezclilla, la camisa no recuerdo. El que le seguía era un poco más grande y como moreno como de un metro setenta y cinco, contextura fuerte, no gordo, pantalón oscuro, camisa oscura, pelo como lacio corto. El grande era grueso, como gordo, como de un metro ochenta, de ropa oscura este era el que tenía la esposa en su mano. (La mujer era como macha, un poco delgada o normal más bien) no recuerdo su vestimenta. Es todo. leída que fue la anterior declaración al compareciente en voz alta, la ratifica y firma. f) Lic. Marvin Vega Rivera Juez

Juan Carlos

# EXHIBIT D

JUDICIAL INVESTIGATIVE BODY               DA-2034-97-PF      29
FORENSIC MEDICINE DEPARTMENT                  572-2-9?
FORENSIC PATHOLOGY SECTION

## L E G A L    M E D I C A L    O P I N I O N

December 16,1997

                              JUDICIAL INVESTIGATIVE BODY

                               Forensic Medicine Dept.
Gentlemen                     Referred:
Mayor's Office
LA UNION                          (Signed)

                                   Chief


Gentlemen:

      Pursuant to the findings in Autopsy No. 97-2034, performed
at thirteen hours and ten minutes,on November nineteenth nineteen
ninety seven, pertaining to ANDRES BORRASE TAYLOR, age forty eight
who weighed in at eighty eight kilos, was one hundred seventy
seven centimeters tall, and who expired in Tres Rios, at nineteen
hours and twenty to minutes on November eighteenth of this year;
I represent the following:

      CAUSE OF DEATH:   Laceration of the heart

      INJURIES FOUND:  1-  Seven firearm gunshot wounds distribu-
      ted as follows:

1-  Posterior Thorax with: Entry Orifice: 0.3 cm. diameter,
with contusion ring 0.1 cm. wide and surrounded by ecchymo-
tic ring 1 cm. diameter (Puppe Wekgartner Sign) due to
impression of the firearm. Located at a height of 150 cm.
and on the vertebral median line,on the upper region of the
thorax.
Trayectory:  From back to front, from up to down, from left
to right. It penetrated the thorax,lacerating the right
lung and the right subclavian artery.
Exit Orifice:  From 0.6 X 0.3 cm.at 148 cm. high and at
6 cm. of the median line on the right infraclavicular
section. A bullet was found in that location.

2-  Posterior thorax with:  Entry Orifice:  0.3 cm. diame-
ter with contusion ring 0.1 cm. wide, pale ecchymotic ring
2 cm. diameter from impression of the firearm (Puppe
Wekgartner Sign). Located at a height of 143 cm. and at
7 cm. of the median line on the left vertebral interscapu-
lar region.
Trayectory:  From back to front, from up to down, from
left to right. It penetrated the thorax,lacerating the
aorta, the pulmonary artery and the heart. The bullet was
found in the posterior side of the body of the sternum.
Exit Orifice:  None.

                              Oval Stamp:

JUDICIAL INVESTIGATIVE BODY
FORENSIC MEDICINE DEPARTMENT
FORENSIC PATHOLOGY SECTION

3- Posterior thorax with: Entry Orifice: 0.3 cm.diameter
with contusion ring 0.1 cm. wide,surrounded by ecchymotic
ring 1 cm. diameter from impression of the firearm (Puppe
Wekgartener Sign). Located at 141 cm high and at 9.5 cm.
of the median line,on the left vertebral interscapular
section.
Trayectory: From back to front, from down to up, from right
to left; it penetrated the thorax,lacerating the left lung.
The bullet was found in the major pectoral muscle of the
left side of the anterior thorax.
Exit orifice: None.

4- Posterior thorax with: Entry Orifice:0.3 cm. diameter,
with contusion ring 0.5 cm. wide and pale violet like
ecchymotic ring 1 cm. diameter from impression of the fire-
arm (Puppe Werkgartner Sign). Located at 142 cm high and
13 cm. from the median line on the left scapular region.
Trayectory: From back to front, from up to down, same
sagital plane. It penetrated the thorax, lacerated the left
lung.
Exit Orifice: None.

5- Posterior thorax with: Entry orifice: 0.3 cm.diameter,
with contusion ring 0.1 cm. wide,with excoriated ecchymotic
ring 2 cm. diameter from impression of the firearm (Puppe
Wekgartner Sign). Located at 144 cm. high and 14 cm. from
the median line on the left scapular region.
Trayectory: From back to front, from up to down, from left
to right. It penetrated the thorax and lacerated the left
lung .
Exit orifice: 1 X 0.5 cm. at 140 cm/ high and 9 cm. from
the median line,in the left mammary region.

6- Neck with: Entry orifice: 0.5 cm. X 0.3 cm. with
contusion ring o.1 cm.wide, located at 158 cm. high and at
5 cm. from the median line,on the left side region, infra-
mandibular.
Trayectory: From up to down, from front to back, same
sagital plane. It lacerated the superficial soft tissue.
Exit orifice: 0.5 cm/ Located at 156 cm. high,at 4 cm.
from the median line on the left side region of the neck.

7- Neck with: Entry orifice: 0.5 cm. diameter,with
contusion ring 0.2 cm. wide, located at 154 cm. high, and
at 3.5 cm. from the median line on the left side region of
the neck.

Trayectory: From up to down, from back to front, from
left to right. It lacerated the thyroid cartilage of the

JUDICIAL INVESTIGATIVE BODY
FORENSIC MEDICINE DEPARTMENT
FORENSIC PATHOLOGY SECTION.

larynx, esophagus, soft tissues of the thoracic wall and fractured the right scapula. The bullet was located in the soft tissues of the posterior thoracic wall, in the scapular area.
Exit orifice:  None.
This injury corresponds with a re-entry of the wound described in paragraph #6.

II-     Facial and cranioencephalic trauma:
1-  Hematomas and facial excoriations,with fracture of the nasal bones and the right malar bone.

III-    Trauma in the extremities.

1-  Ecchymosis and excoriations on arms, elbows and knees.

2-  Circular excoriations surrounded by ecchymosis 1 cm. wide, around the left wrist and double around the right wrist, consistent with bindings caused by"metal handcuffs."

MANNER OF DEATH:  Homicidal, from the medical legal criteria.

Analysis of the garments:

1-  Fabric shirt,with buttons, plaid print, short sleeve, green, red and white, with five orifices in the posterior upper, medial and left lateral region (entry points) and one orifice in the left pocket (exit point).

Gag cloth:  orange handkerchief,covered with metallic grey adhesive tape, surrounding and covering the mouth and nape area, with gunshot orifice in the left anterior plane, 0.3 cm.diameter,with smoky edges,0.7 cm. wide and a circular halo 1.8 cm. diameter,with deppressed area around it.

3-  Metal handcuffs (two), one complete one, around both wrists, and another incomplete one,with only one hoop, around the right wrist.

RESULTS OF ANCILLARY TESTS   (Performed by the Dept. of Forensic Sciences Laboratories)

a-  Evaluation of alcohol present:  pending

b-  Evaluation of toxic substances present:  pending

c-  Findings of blood type:  pending

d-  Ballistics tests:  pending

Rectangular stamp                    Oval Stamp

JUDICIAL INVESTIGATIVE BODY
FORENSIC MEDICINE DEPARTMENT                DA-2034-97-PF
FORENSIC PATHOLOGY SECTION

        PHOTOGRAOHY:  For identification purposes, to show
injuries and garments.

Sincerely,

        (Signed)
Dr. Mario Masis Figueroa
FORENSIC PHYSICIAN

                              Referred:

                                   (Signed)

                              Dr. Luis del Valle Carazo
                                      CHIEF

                              FORENSIC PATHOLOGY SECTION

LDVC
MMF/tchf

        Note:  Diagrams are attached (#1 - #2)

                                   Oval Stamp:

                         Judicial Investigative Body
                          Forensic Pathology Sect.
                          Forensic Medicine Dept.

                    ┌─────────────────────────────────────
                    │     T H E   J U D I C I A R Y
                    Contrav. Crtrm. ILLEGIBLE  La Union
                    Maria    J A N  15   1998
                    Elena    R E C E I V E D
                    └─────────────────────────────────────

              JUDICIAL INVESTIGATIVE BODY
              FORENSIC MEDICINE DEPARTMENT
              Referred:
                        (Signed)
                    ─────────────────────────
                          CHIEF



ORGANISMO DE INVESTIGACIÓN JUDICIAL          DA-2034-97-PF
Case 3:04-cv-00365 Document 172-13 Filed 05/07/08 Page 62 of 70
SECCIÓN PATOLOGÍA FORENSE

572-2-
29

# DICTAMEN MEDICO LEGAL

16 de diciembre de 1997

Organismo de Investigación Judicial
DEPARTAMENTO DE MEDICINA LEGAL

Señores
Alcaldía
LA UNIÓN

Estimados señores:

De acuerdo con los hallazgos de la autopsia No 97-2034, efectuada a las trece horas y diez minutos, del diecinueve de noviembre de mil novecientos noventa y siete, correspondiente a ANDRÉS BORRASÉ TAYLOR,de cuarenta y ocho años de edad, pesó ochenta y ocho kilogramos, midió ciento setenta y siete centímetros, quien falleció en Tres Ríos,a las diecinueve horas y veintidós minutos del dieciocho de noviembre del año en curso;  me permito informarles lo siguiente:

**CAUSA DE MUERTE:**   Laceración del corazón.

**LESIONES ENCONTRADAS:**   1-  Siete heridas por proyectil de arma de fuego ubicadas así:

1- Tórax posterior con: Orificio de entrada: de 0,3 cm. de diámetro, con anillo de contusión de 0,1 cm. de ancho y rodeado de un anillo equimótico de  1 cm. de diámetro .(Signo de Puppe Wekgartner) por impronta de la boca de fuego.Localizado a 150 cm. de altura  y n la línea media vertebral, en la región superior del tórax.

Trayecto: de atrás hacia adelante, de arriba hacia abajo, de izquierda a derecha. Penetra al tórax, lacera el pulmón derecho, la  arteria subclavia derecha.

Orificio de salida: de 0,6 x 0,3 cm. a  148 cm. de altura y a 6 cm. de la línea media en la región infraclavicular derecha. En ese sitio se localizó un proyectil.

2-  Tórax posterior con:  Orificio de entrada: de 0,3 cm. de diámetro, con anillo de contusión de 0,1 cm. de ancho, un anillo equimótico tenue de 2 cm. de diámetro , por impronta de la boca de fuego (Signo  de Puppe Wekgartner ). Localizado a 143 cm. de altura y a 7 cm. de la línea media en la región  interescapulo vertebral izquierda.

Trayecto:  de atrás hacia adelante, de arriba hacia abajo, de izquierda a derecha.Penetró al tórax, lacera la arteria aorta, la arteriopulmonar, y el corazón. Localizándose el proyectil, en la cara posterior del cuerpo del  esternón.

Orificio de salida: No hubo.

3-  Tórax posterior con:  Orificio de entrada: de 0,3 cm. de diámetro, con anillo de contusión de 0,1 cm. de ancho, y rodeado de un anillo equimótico de 1 cm. de diámetro por impronta de la boca de fuego (Signo de Puppe Werkgartner ).Localizado a 141 cm. de altura y a 9.5 cm. de la línea media, en la región interescapular vertebral izquierda.



Trayecto: de atrás hacia adelante, de abajo hacia arriba, de derecha a izquierda, penetró al tórax, lacerando el pulmón izquierdo, localizándose el proyectil en el músculo pectoral mayor del lado izquierdo del tórax anterior.
Orificio de salida: no hubo.

4- Tórax posterior con: Orificio de entrada: de 0,3 cm. de diámetro, con anillo de contusión de 0,5 cm. de ancho, y un anillo equimótico violáceo tenue, de 1 cm. de diámetro, por impronta de la boca de fuego (Signo de Puppe Werkgartner).Localizándose a 142 cm. de altura y a 13 cm. de la línea media en la región escapular izquierda.
Trayecto: de atrás hacia adelante, de arriba hacia abajo, mismo plano sagital. Penetró al tórax, lacera el pulmón izquierdo.Fractura el campo de la quinta vértebra dorsal. Se localizó el proyectil en el músculo pectoral mayor del lado izquierdo, d la pared anterior del tórax.
Orificio de salida: no hubo.

5- Tórax posterior con: Orificio de entrada: de 0,3 cm. de diámetro, con anillo de contusión de 0,1 cm. de ancho con anillo equimótico y excoriado de 2 cm. de diámetro, por impronta de la boca de fuego (Signo de Puppe Werkgartner). Localizándose a 144 cm. de altura y a 14 cm. de la línea media, en la región escapular izquierda.
Trayecto: de atrás hacia adelante, de arriba hacia abajo, de izquierda a derecha.Penetra al tórax y lacera el pulmón izquierdo.
Orificio de salida: de 1 x 0,5 cm. , a 140 cm. de altura y a 9 cm de la línea media, en la región mamaria izquierda.

6- Cuello con: Orificio de entrada: de 0,5 x 0,3 cm. con anillo de contusión de 0,1 cm. de ancho, localizado a 158 cm. de altura y a 5 cm. de la línea media, en la región lateral izquierda, inframandibular.
Trayecto de arriba hacia abajo, de adelante hacia atrás, mismo plano sagital.Laceró el tejido blando superficial.
Orificio de salida: de 0,5 cm. Localizado a 156 cm. de altura, a 4 cm. de la línea media en la región lateral izquierda del cuello.

7- Cuello con: Orificio de entrada: de 0,5cm. de diámetro con anillo de contusión de 0,2 cm. de ancho, localizándose a 154 cm. de altura y a 3.5 cm. de la línea media, en la región lateral izquierda del cuello.
Trayecto de arriba hacia abajo, de adelante hacia atrás y de izquierda a derecha. Laceró el cartílago tiroides de la laringe, esófago, tejidos blandos de la pared del tórax, fracturó la escápula derecha. Localizándose el proyectil en los tejidos blandos, de la pared posterior del tórax, en el área escapular.
Orificio de salida. no hubo.
Esta herida corresponde a una reentrada de la herida descrita en el punto #6.

II- Trauma craneoencefálico y facial

Organismo de Investigación Judicial
DEPARTAMENTO DE MEDICINA LEGAL
Refrendado:
Jefe

ORGANISMO DE INVESTIGACIÓN JUDICIAL
SECCIÓN DE PATOLOGÍA FORENSE
DEPARTAMENTO DE MEDICINA LEGAL

Case 2:08-cv-00611 Document 12-13 Filed 05/02/08 Page 64 of 70
DA-3034-97-PF

1- Hematomas y excoriaciones faciales, con fractura de los huesos nasales y del hueso malar derecho.

III- Trauma en extremidades

1- Equímosis y excoriaciones, en brazos, codos y rodillas.

2- Excoriaciones circulares, rodeadas de equímosis de 1 cm. de ancho, alrededor de la muñeca izquierda y doble alrededor de la muñeca derecha, compatible con ataduras con "esposas metálicas".

**MANERA DE MUERTE :**   Homicida, desde el punto de vista médico legal.

**Estudio de las ropas:**

1- Camisa de tela, con botones, a cuadros, manga corta, verde, rojo y blanco, con cinco orificios, en la región posterior y superior y medial y lateral izquierda (sitios de entradas) y un orificio en la bolsa izquierda (sitio de salida).

2- Mordaza: paño de manos color anaranjado cubierto con cinta adhesiva, color gris metálico, que rodea y cubre la boca y la región nucal, observándose en su región anterior izquierda un orificio de proyectil de arma de fuego de 0,3 cm. d diámetro, de borde ahumado de 0,7 c. de ancno y un halo circular de 1,8 cm. de diámetro a su alrededor deprimido.

3- Esposas metálicas (dos), una completa, alrededor de ambas muñecas, y otra incompleta, con solo un aro alrededor de la muñeca derecha.

**RESULTADO DE EXÁMENES AUXILIARES**      (Realizados por el Depto. de Laboratorios de Ciencias Forenses).

a- Determinación de alcohol: pendiente.

b- Determinación de tóxicos: pendiente.

c- Determinación de grupo sanguíneo: pendiente

d- Balística: pendiente.





Case 2:09-cv-10259-LL Document 2-13 Filed 06/02/09 Page 65 of 70

FOTOGRAFÍA: Para identificación, para mostrar lesiones y de las ropas.

Atentamente,

Dr. Mario Masís Figueroa
MÉDICO FORENSE

Refrendado:

Dr. Luis Del Valle Carazo
JEFE
SECCIÓN PATOLOGÍA FORENSE

LDVC:
MMF/tchf
Nota: Se adjuntan diagramas (#1 - #2)







# EXHIBIT E

**NANCY KAHN, L.C.S.W., A.C.S.W.**

102 BAR BEACH ROAD
PORT WASHINGTON, NEW YORK 11050

Re: Pacheco-Carvajal, Maria
244 Water Lane South
Wantagh, New York 11793

### Psychosocial/Family Assessment

I am a New York State Licensed Clinical Social Worker and a member of the National Academy of Certified Social Workers, having practiced in the field 35 years post Master's from Boston University. Presently, I work full time at New York Hospital Queens, where I provide counseling and discharge planning services to patients and families from a wide variety of countries due to the multicultural makeup of the Flushing area. In addition, I have a private practice specializing in immigration issues.

This assessment is based on a lengthy interview conducted on 10/25/08 at the home of Maria Carvajal, (D.O.B. 3/27/70), and a brief telephonic interview with Maria herself. However, as Maria is currently in detention, it was mostly left to her U.S. Citizen husband, Marcos Carvajal, (D.O.B. 9/5/65), to tell her story as best he could. Also present at the interview were their 3 U.S. Citizen children: their daughter, Nathalia Carvajal, (D.O.B. 1/27/00), their son, Gabriel Carvajal, (D.O.B. 5/3/04), and their daughter, Ariana Carvajal, (D.O.B. 8/9/06). The Carvajal home is a spacious single family dwelling set on a quiet street in a South Shore, Long Island neighborhood. The front yard is beautiful planted with colorful flowers and the back yard is full of the children's toys. Inside the traditionally furnished, well kept home there are marble tile floors throughout the first floor. Festive Halloween art projects done by the children are prominently displayed, as are family photos. A fluffy white dog, a cat, a bird and a fish join the human inhabitants of the household. The family members present as well groomed and neatly dressed in casual weekend attire.

This sanguine scene would seem to represent a family living the American dream. However, their situation is completely marred by the absence of Maria, wife and mother, and by the devastating prospect that she could be deported. This has caused the family members extreme emotional, psychological and financial hardship. A negative outcome in this case would serve to exacerbate the depression and anxiety Marcos and the children are all ready experiencing.

Maria Carvajal, nee Pacheco, is a 38 year old Hispanic woman, born in Costa Rica in the city of Alajuela. She grew up in the city's agricultural outskirts, where her father was a coffee farmer and her mother was homemaker. Maria has 3 brothers and 1 sister. She was brought up as a Roman Catholic. Although the Pachecos owned a house, they were poor and it was hard to make ends meet. Despite their struggles, Maria's

family was close and her parents made sure she got a good education. After graduating from the public high school, she went on to college in San Jose, the capitol city, where she shared an apartment with some other students. After college, Maria worked for her brother, doing sales for his credit card company.

Maria knew Marcos Carvajal during her childhood, as he grew up in the same neighborhood. Later, when she was about 20 years old, he asked her out, but she declined at that time as she had a boyfriend. However, in 1999, when she was 29 years old, Maria fled Costa Rica because she feared for her life. When she got to the United States, it was Marcos she turned to, seeking refuge with him, and he agreed. Later, when she was in custody by Immigration Customs Enforcement, Maria filed for asylum and other relief. Maria came to like "everything" about Marcos, who was so welcoming and helpful, and the two young people fell in love, becoming a couple who lived together for years, had 3 children together and eventually officially married on 7/25/08, while Maria was incarcerated in Hudson County Jail.

Marcos Carvajal is a 43 year old native of Costa Rica, who like Maria, grew up in the town of Palmares. His father, deceased many years ago, sold lotto cards, and his mother, who died 3 years ago, was a homemaker who raised a large brood of children. Marcos has 9 living brother and sisters, and the family lost 3 other children. The many members of the family crowded into a small one-room house, and they were very poor. However, his mother and father had a good marriage and they were loving and emotionally supportive to the children.

Never very interested in academics, Marcos attended public school until the age of 11, when he was in a serious automobile accident. He sustained multiple fractures and a head injury, which kept him in the hospital for 5 months and bed bound at home for the remainder of 2 years. He returned to school for a year when he was 13, but he did not like it and by then he was thinking about traveling to look for a better paying job than he could get in Costa Rica. Over the next few years this teenager went to Panama, where he worked on a banana plantation for a few months, to Nicaragua where he worked in a shoe factory, and then worked on a ship traveling to several different countries. His last journey took him to Houston, Texas in 1984, and he has lived in the United States ever since then.

Marcos moved to New Jersey where he worked in a country club kitchen as a chef, and then to Long Island, New York, where he worked in several different restaurants. During these years, Marcos was briefly married to his first wife, Rosa, who had children from a previous relationship, but this just did not work out and he was later divorced.

By the time Maria arrived here, Marcos was already renting their current house, which they later purchased. Marcos's mother had spoken so well of Maria as a person, and Marcos agreed that she was very nice, as well as highly intelligent. Marcos had started his own business, Carvajal Landscaping, and Maria became an integral part of the operation doing bookkeeping and customer relations. Now, with Maria's help, the business has built up and Marcos employs 2 other people. Thus, this couple became successful business partners as well as loving life partners.

Both Maria and Marcos were happy and excited about the arrival of their children, all 3 of whom were born at full term via Caesarian Sections at Winthrop University Hospital. They were all born healthy, but all of them had some developmental delays,

particularly in speech and language, and all of them required the services of an Early Intervention Program. Ariana continues to receive services, and continues to lag behind in language skills.

Nathalia, now age 8, is in the 3rd grade at the Gardeners Avenue Elementary School. She gets fairly good marks, but her teacher notes in her last report card that she is still struggling in some of her academic areas. When Nathalia is not in school, like most American children, she likes to watch "Spongebob Squarepants" and "That's So Raven" on television. When she grows up, she wants to be a chef or a veterinarian. In term of her emotional state, Nathalia is a study in contrasts. At some points she appears to be a confident "little mother," who feels she must take on Maria's roles in the household. At other points she regresses, dissolving into tears when her little brother bothers her. Maria has noticed that when Nathalia visits her in detention, she wants to be held and treated like a baby.

This is not surprising behavior for a child who has suffered the trauma of suddenly losing a parent. Nathalia clearly remembers the frightening day last April when she came back home from school to find that U.S. agents had arrested Maria. Now she reports that when she visits Maria, the "police" are always watching and checking the time. Nathalia feels very sad when she has to leave and she angrily states, "I hate those policemen." She doesn't sleep well lately and she has bad dreams, including one in which a vampire wants to take her away.

Gabriel, now age 4, is in Pre K. He speaks with a marked lisp, and appears to have a very limited attention span. He was unable to complete the drawing tasks given to him. Marcos notes that of all the children, Gabriel is the one who has been crying the most since Maria was arrested. Of course he has no real understanding of what is going on, and when he visits Maria, he breaks her heart by constantly asking her "How many days are there until you come home?" Maria also laments that sometimes she feels that Ariana, who was under 2 years old when Maria was arrested, does not seem to know her.

Like the children, Marcos is struggling to cope. He is clearly depressed and anxiety ridden. He has developed a sleep disorder, waking up in the middle of the night with his thoughts reeling. He tries to pray to calm himself. Marcos has lost his appetite and as a result has lost 40 pounds. He has gastric disturbances and frequent headaches. He often feels fatigued. Marcos gets withdrawn and must force himself to see to the work and childcare tasks that must get done. Marcos feels empty inside and has a sense of hopelessness. All of these are symptoms of his reactive depression. Although he feels overwhelmed handling everything himself, and sometimes he fears he can't make it, it is his deep love for his children that keeps him going. He has had to hire a babysitter for when he is at work, and this has put a strain on him financially, so this is another thing that is weighing on his shoulders.

If everything can be resolved in Maria's favor, Marcos has a positive vision of the future for himself and the family. He wants to continue renovating the house with an eye toward selling it and purchasing one closer to the water. With Maria as his helpmate, he wants to expand his business. He sees the family resuming their regular activities such as trips together to zoos and aquariums, barbeques, and holiday parties. He wants the children to get a good education and to be able to choose whatever careers they aspire to.

On the other hand, Maria's extradition and/or deportation would be devastating to all concerned, so much so that Marcos does not even let himself think about it. He does

not want to go back to Costa Rica where he knows he could not replicate the earnings he has worked so hard for here. He also does not feel it would be a conducive environment for the well being of the children, as there would be much more of an awareness of Maria's legal troubles.

Being here without Maria would exacerbate Marcos's depression and struggle to manage his responsibilities, causing him extreme hardship. He would be so anxious about Maria, and would continue to help her in every way to fight her case. At the same time he would be so worried about the children and their reactions. Maria had always been the primary caregiver for the children, the one who reads to them and helps them with their homework. As Marcos puts it simply, "These children need their mother." Losing her permanently would put them at risk of a range of psychological problems from depression and withdrawal to acting out behaviors and school phobia.

Nathalia illustrated this dramatically. When asked to draw a picture of how she would feel if her mother had to leave the United States, Nathalia, who had earlier drawn herself and her family confidently smiling, now drew a picture of herself behind thick black bars in a prison cell. Her figure is wearing a ball and chain, and is crying copious blue tears. Her explanation of this terrible scene was "I feel like I'm in jail because Mommy isn't here with me."

Marcos Carvajal is an industrious man who has worked hard in the more than 20 years that he has been here. He has proudly become a U.S. Citizen. Since Maria's arrival, he has also proven himself to be a loving, helpful husband and a responsible, caring father. He deserves to have his wife and partner restored to him, to remain here by his side. Keeping the family intact would also be the optimal outcome for these U.S. Citizen children, as it will be the best way to ensure their psychological health, and to help them achieve their aspirations. Any other result would have grave consequences for Marcos, Nathalia, Gabriel and Ariana, and thus would be a profound disservice to this engaging family.

Respectfully submitted,

Nancy Kahn, Lcsw, Acsw

Nancy Kahn, L.C.S.W., A.C.S.W.
New York State License #:
PR015441-1

10/26/08